976 P.2d 399

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Kent D. STOCKER, Defendant–Appellant.**

No. 21277

Supreme Court of Hawai'i.

Feb. 19, 1999.

Laura Yoshida, Deputy Public Defender, on the briefs, for Defendant–Appellant Kent D. Stocker.

Alexa D.M. Fujise, Deputy Prosecuting Attorney, on the briefs, for Plaintiff–Appellee State of Hawai'i.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by LEVINSON, J.

The defendant-appellant Kent D. Stocker appeals from his guilty conviction of, and sentence for, one count of harassment, in violation of Hawai'i Revised Statutes (HRS) § 711–1106(1)(a) (Supp.1998).[1] On appeal, Stocker argues that insufficient evidence was adduced to prove that: (1) he committed harassment, pursuant to HRS § 711–1106(1)(a); and (2) his actions were not justified by the parental discipline defense, pursuant to HRS § 703–309(1) (1993).[2] We agree with Stocker that the prosecution failed to adduce sufficient evidence to rebut his justification defense. Accordingly, we reverse his judgment, guilty conviction, and sentence.

1. HRS § 711–1106(1)(a) provides in relevant part that "[a] person commits the offense of harassment if, with intent to harass, annoy, or alarm any other person, that person: ... [s]trikes, shoves, kicks, or otherwise touches another person in an offensive manner or subjects the other person to offensive physical contact[.]"

2. HRS § 703–309 provides in relevant part:
 Use of force by persons with special responsibility for care, discipline, or safety of others. The use of force upon or toward the person of another is justifiable under the following circumstances:
 (1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor, or a person acting at the request of the parent, guardian, or other responsible person, and:
 (a) The force is employed with due regard for the age and size of the minor and is reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct; and

I. BACKGROUND

On October 2, 1997, Stocker was charged by way of complaint with one count of harassment, in violation of HRS § 711–1106. A bench trial was conducted in the family court of the first circuit on December 16, 1997. The following evidence was adduced at trial.

Joann Leiwalo testified that she and Stocker had been divorced for three years prior to the incident giving rise to the present case. As a result of the divorce, Leiwalo gained "full custody" of the couple's two children, Shane Stocker (hereinafter, Shane), an eleven-year-old boy, and Lekisha Stocker (hereinafter, Lekisha), an eight-year-old girl. Both Leiwalo and Stocker testified, however, that Stocker retained "visitation rights." Stocker described his visitation rights as follows: "I'm allowed to see the children—I'm allowed to pick them up on Fridays and drop them off on Sundays."[3] Moreover, Stocker was allowed to call his children on Tuesdays and Thursdays. However, Stocker testified that he frequently missed his scheduled visitation because "a lot of times when I call, nobody—at that certain time they're suppose [sic] to be there. And nobody is around."

On Friday, June 20, 1997,[4] Stocker went to Leiwalo's parent's home in Pearl City, in the

 (b) The force used is not designed to cause or known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage.
 (Emphases added.)

3. During her testimony, Leiwalo agreed that, pursuant to Stocker's visitation rights, the children "can go over to his house on the weekends," noting that "that's what the Judge said."

4. It does not appear that any evidence was introduced that June 20, 1997 was a Friday. However, we take judicial notice of that fact because it is helpful to our analysis, see infra section III. B.1, and is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Hawai'i Rules of Evidence (HRE) Rule 201(b) (1993). Cf. Territory v. Makaena, 39 Haw. 270, 275 (1952) (taking judicial notice of the time of sunrise on May 25, 1949); Kapiolani v. Mahelona, 9 Haw. 676, 678 (1895) (taking judicial notice of the date of the King's birthday celebration).

City and County of Honolulu, to give Shane a birthday card. Stocker testified that, due to strained relations between himself and Leiwalo's parents, he made a point of not entering their home without their permission. Although, according to Shane's testimony, Leiwalo's mother was at home, Stocker apparently did not request permission to enter. Instead, he remained in the doorway while talking with Shane and Lekisha.

Shane testified that, when Stocker arrived, Shane brought his two chameleons to the door to show them to his father.[5] Stocker then "flung" several birthday cards and an envelope with money at Shane's chest. At several points during his testimony, Shane claimed that Stocker had "punched" him in the chest. However, at another point, he testified that Stocker had hit him in the chest "only [with] the cards" and not "with anything else." Similarly, at several points, Shane testified that the "punch" had occurred while Stocker was "playing with [him]." At other points, however, Shane testified that Stocker had "punched" him because "he was mad at [him]" and that the "punch" had been thrown "when [Stocker] wasn't playing around." Shane agreed that he had been upset because he "felt [that his] dad ... was playing too rough[.]" Stocker told Shane that he wanted Shane to accompany him to his home. Shane told his father that he did not want to do so and went back into the house to watch television while Stalker conversed with Lekisha.

At some later point, Stocker directed Shane to come back to the door, but Shane refused. Indeed, Stocker asked Shane to return "more than once." Shane testified that Stocker "was yelling" at him at the time. Shane was already crying because Stocker had "punched [him] in the chest before— after he was flinging the cards." Stocker then slapped Shane "on one side of [his] face" with "an open hand." Shane described the force of the blow as "between the hard and soft" and agreed that it "didn't hurt ... [o]nly hurt a little bit." He admitted that he had not been bruised or marked as a result of the slap. Asked how the slap felt, Shane

answered, "I don't know, just started to make me cry."

Afterwards, Stocker apparently calmed down and joked with Shane about kissing him. Instead, he shook Shane's hand and then left.

Lekisha testified that Stocker "punched Shane in the chest and pulled his shirt. And over here came red." He then showed Shane a birthday card and an envelope with money in it. Stocker later "screamed" at Shane to come to him and "Shane started crying." Stocker seemed to become angry. Lekisha did not testify that Stocker slapped Shane.

Leiwalo testified that, on June 20, 1997, she received a telephone call at work from Shane, who was "crying hysterically." She left work and went to her parents' home. When she arrived, Shane was still crying and "his face was red ... 'cause he was crying I guess so much." Shane told her "that his father hit him.... On the chest part." That was "the only place that Shane complained of[.]" He also told her that Stocker had hit him because "[h]e just didn't want to go to his father[.]" Leiwalo did not notice any injuries on Shane.

Following Leiwalo's testimony, the prosecution rested its case-in-chief. Stocker made an oral motion for a judgment of acquittal, arguing that the prosecution had adduced insufficient evidence to convict him and to rebut his defense of parental discipline. During the arguments, the family court observed that "[t]he thing I'm worried about is the state of mind.... That's the only issue." After argument, the family court denied the motion, ruling that, "as to ... the slap as opposed to the punch," the prosecution had adduced enough evidence for a reasonable mind to conclude that Stocker was guilty.

Stocker testified in his own defense, *inter alia*, that he did not remember punching Shane. He testified that he had "probably" scolded Shane when he refused to come to him when called and that he had "probably raised [his] voice and told him, get over here now[.]" He further testified that he did not

5. Shane testified with respect to the circumstances surrounding Stocker's visit in a disjoint-ed fashion, making the chronology of events difficult to reconstruct with certainty.

recall slapping Shane, but "if I did anything like that at all, it was probably a playful kind of thing or a little just—. . . check yourself kind of thing[.]" He elaborated that he "probably would have tapped him like that on the head. I don't know. I'm around kids every day, and I . . . play with them more rough then I play—do anything like that. And these are little kids." He denied doing anything to "hurt Shane on that day." He admitted that Leiwalo had custody of both of their children and that he retained only visitation rights.

Prior to closing arguments, the family court stated that, "to narrow the argument, I don't believe the government has proved it[ ]s case with . . . respect to the punch to the chest. . . . We're only talking about the slap." The family court further indicated that *"[t]he one issue in my mind is the proportionality."* (Emphasis added.) After arguments, the family court reiterated that "[t]he punch, I throw out, because I don't believe the government has proved it[ ]s case." However, noting this court's opinion in *State v. Crouser,* 81 Hawai'i 5, 911 P.2d 725 (1996), the family court observed, with regard to the slap, that,

> even if we assume that this is reasonably believed necessary to protect the welfare of the recipient, and I agree a parent has the right and the obligation to . . . discipline his child . . . [,] I don't know if this is reasonably proportioned. That's the one hang up I have here. I mean when a child doesn't come to you, I agree that you have right to discipline. And now, whether that includes a slap across that face—that's the part that I have a problem with.

The family court described its understanding of the facts as follows:

> THE COURT: . . . [Y]ou have the state of facts where someone is punched in the chest, whether in play or—I'm not sure why that occurred, that never was made clear. Boy starts to cry, he steps back, whether from force of the blow or not, it's not made clear either.
>
> Boy goes to the couch, father says to come over here. Father—boy refuses to. *And then father slaps boy across the face as a means of discipline for his refusal to come over.* I think that's basically the fact pattern here, isn't it?
>
> [DEFENSE COUNSEL:] Well, except that the boy refused . . . more than once.
>
> THE COURT: All right. *He refused more than once.*

(Emphases added.)

Finally, the family court found Stocker guilty as follows:

> THE COURT: . . . Well, it's a close case. Mr. Stocker, I am going to find the government has proved it[ ]s case beyond a reasonable doubt.
>
> This may be something that should be resolved at the appellate court level. I think *that is the one thing I cannot find, that the slap under these circumstances was reasonably proportional to the misconduct being punished.* Okay.
>
> So, you know, we may have to have this resolved in the appellate courts. It's a difficult question.

(Emphasis added.) After the family court announced its verdict, the following colloquy occurred:

> THE COURT: . . . All right. Is there anything with respect to—I know that Mr. Stocker has no record. Is that correct?
>
> MR. STOCKER: Can I say one thing?
>
> THE COURT: Yes.
>
> MR. STOCKER: I don't know if the slap was even—was to discipline him for not coming. I probably just scolded him for not coming. But if I slapped him, it was probably just—I don't think it was for—out of discipline or not—so, I don't know, but—
>
> THE COURT: Oh, well then—but that's worse—
>
> MR. STOCKER: It was more of a playful—
>
> THE COURT:—Mr. Stocker. You don't want to say that.
>
> MR. STOCKER:—kind of thing. Oh, I don't want to say that. Okay. Never mind.
>
> THE COURT: No.

The family court sentenced Stocker to six months of probation and filed its judgment the same day, December 16, 1997. Stocker's

timely notice of appeal was filed on January 14, 1998.

## II. *STANDARDS OF REVIEW*

### A. *Sufficiency Of The Evidence*

 "[Judgments] based on conflicting evidence will not be set aside where there is substantial evidence to support the [trier of fact's] findings." *Tsugawa v. Reinartz,* 56 Haw. 67, 71, 527 P.2d 1278, 1282 (1974). We have defined "substantial evidence" as "credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion." *See, e.g., In re Doe, Born on January 5, 1976,* 76 Hawai'i 85, 93, 869 P.2d 1304, 1312 (1994) (citations omitted) (brackets in original).

*Aga v. Hundahl,* 78 Hawai'i 230, 237, 891 P.2d 1022, 1029 (1995). "[I]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the [trier of fact]." *State v. Buch,* 83 Hawai'i 308, 321, 926 P.2d 599, 612 (1996) (citation omitted). "We have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction." *State v. Batson,* 73 Haw. 236, 248, 831 P.2d 924, 931 (1992), *reconsideration denied,* 73 Haw. 625, 834 P.2d 1315 (1992) (citations omitted).

*State v. Lee,* 90 Hawai'i 130, 134, 976 P.2d 444, 448 (App.1999) (quoting *State v. Bautista,* 86 Hawai'i 207, 210, 948 P.2d 1048, 1051 (1997) (some brackets added and some in original)).

### B. *Interpretation Of A Statute*

 "[T]he interpretation of a statute ... is a question of law reviewable *de novo.*" *State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara,* 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura,* 80 Hawai'i 8, 18, 904 P.2d 893, 903

(1995); *State v. Higa,* 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied,* 79 Hawai'i 341, 902 P.2d 976 (1995); *State v. Nakata,* 76 Hawai'i 360, 365, 878 P.2d 699, 704, *reconsideration denied,* 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

*Gray v. Administrative Director of the Court,* 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto,* 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute ·and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists....

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1983) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. On avenue is the use of legislative history as an interpretive tool.

*Gray,* 84 Hawai'i at 148, 931 P.2d at 590 (quoting *State v. Toyomura,* 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be

called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*Ho v. Leftwich,* 88 Hawai'i 251, 256–57, 965 P.2d 793, 798–99 (1998) (quoting *Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawai'i 217, 229–30, 953 P.2d 1315, 1327–28 (1998)).

## III. *DISCUSSION*

### A. *Sufficient Evidence Was Adduced To Prove The Basic Elements Of Harassment, As Proscribed By HRS § 711–1106(1)(a).*

Stocker first argues that the prosecution failed to adduce substantial evidence that (1) he slapped Shane "in an offensive manner," (2) the slap "subjected Shane to an offensive physical contact under HRS § 711–1106(1)(a)," *see supra* note 1, and (3) he acted with the intent to harass, annoy, or alarm Shane. We disagree.

 Stocker notes that, in *State v. Kupau,* 63 Haw. 1, 8, 620 P.2d 250, 254 (1980), this court differentiated between harassment, on the one hand, and assault in the third degree as defined by HRS § 707–712,[6] on the other, *inter alia,* on the basis that "HRS § 711–1106 is concerned with the offensive nature of the touching to one's sensibilities. The impact of harassment is on one's psyche and mental well-being rather than bodily injury as in an assault in the third degree." He notes that Shane testified that he had already been crying before being slapped. He then concludes that no evidence was adduced that the slap affected Shane's mental well-being.

However, the family court could reasonably have inferred from Shane's testimony that, although Shane had already been crying before his father slapped him, the slap caused renewed or more intense crying. Moreover, the family court could reasonably have inferred, from Leiwalo's testimony that Shane called her hysterically crying after Stocker left, that Shane was very much upset by the slap. It is simply disingenuous to claim that a slap across the face during an argument does not constitute "[s]trik[ing] . . . another person in an offensive manner."

 With regard to the requisite state of mind, Stocker argues that, because the slap was meted out for purposes of discipline, he could not have acted with "intent to harass, annoy, or alarm" Shane. *See supra* note 1. In support, he draws this court's attention to commentary interpreting Model Penal Code (MPC) § 250.4(5) (1980). MPC § 250.4 provides that

> [a] person commits a petty misdemeanor if, with purpose to harass another, he:
>
> (1) makes a telephone call without purpose of legitimate communication; or
>
> (2) insults, taunts or challenges another in a manner likely to provoke violent or disorderly response; or
>
> (3) makes repeated communications anonymously or at extremely inconvenient hours, or in offensively course language; or
>
> (4) subjects another to an offensive touching; or
>
> (5) *engages in any other course of alarming conduct serving no legitimate purpose of the actor.*

(Emphasis added.) The commentary on MPC § 250.4(5) notes that "[t]he import of the phrase . . . is broadly to exclude *from this subsection* any conduct that directly furthers some legitimate desire or objective of the actor." Commentary on MPC § 250.4 at 368 (emphasis added). Because he was furthering a legitimate purpose, Stocker maintains that he could not have possessed the requisite state of mind to be guilty of harassment.

Stocker's argument is not even internally consistent. MPC §§ 250.4(4) and (5) are expressly made alternative to one another through the use of the conjunctive "or." Thus, even pursuant to the MPC, a "legitimate purpose" has no bearing on a case of

---

**6.** HRS § 707–712 (1993) provides in relevant part:

> **Assault in the third degree.** (1) A person commits the offense of assault in the third degree if the person:

> (a) Intentionally, knowingly, or recklessly causes bodily injury to another person; or
>
> (b) Negligently causes bodily injury to another person with a dangerous instrument.

"offensive touching." Moreover, although, as originally promulgated, HRS § 711–1106 contained a subsection (1)(e), which "included as the offense of harassment the case where a person 'engages in any other course of harmful or seriously distressing conduct serving no legitimate purpose of the defendant,'" that subsection was *deleted* by a 1973 amendment. *See* Supplemental Commentary on HRS § 711–1106.

Accordingly, an "illegitimate purpose" is not an element of the offense of harassment, as defined by HRS § 711–1106(1)(a), *see supra* note 1. Instead, the Hawai'i Penal Code (HPC) provides for parental discipline as a "justification" *defense* in HRS § 703–309, which we address *infra* in section III.B.

We are thus drawn back to the oft-repeated proposition that,

> [g]iven the difficulty of proving the requisite state of mind by direct evidence in criminal cases, "[w]e have consistently held that ... proof by circumstantial evidence and reasonable inferences arising from circumstances surrounding the [defendant's conduct] is sufficient.... Thus, the mind of an alleged offender may be read from his acts, conduct and inferences fairly drawn from all the circumstances." *State v. Sadino*, 64 Haw. 427, 430, 642 P.2d 534, 536–37 (1982) (citations omitted); *see also State v. Simpson*, 64 Haw. 363, 373 n. 7, 641 P.2d 320, 326 n. 7 (1982).

*State v. Mitsuda*, 86 Hawai'i 37, 44, 947 P.2d 349, 356 (1997) (quoting *State v. Batson*, 73 Haw. 236, 254, 831 P.2d 924, 934, *reconsideration denied*, 73 Haw. 625, 834 P.2d 1315 (1992) (footnote omitted)) (brackets and ellipsis points in original). In the present matter, there is substantial evidence that, after becoming angry and "yelling" at Shane, Stocker slapped him in the face. That being so, we hold that the family court could reasonably have inferred that Stocker intended his conduct to "annoy" or "alarm" Shane.

---

7. MPC § 3.08(1) (1980) provides that
 [t]he use of force upon or toward the person of another is justifiable if:

### B. *Insufficient Evidence Was Adduced To Negative Stocker's Parental Discipline Defense Pursuant To HRS § 703–309(1).*

Stocker next argues that the family court erred in ruling that the prosecution had disproved his parental discipline defense beyond a reasonable doubt. In this connection, he asserts (1) that this court's holding in *Crouser* that, for purposes of HRS § 703–309, "use of force must be both reasonably proportionate to the misconduct being punished and reasonably believed necessary to protect the welfare of the recipient," 81 Hawai'i at 12, 911 P.2d at 732, was an erroneous interpretation of the statute and created an unconstitutional new element to the defense and (2) that the family court erred in ruling that the slap was not reasonably related to the purpose of punishing Shane's "misconduct." Stocker's first assertion is meritless. However, we agree with his second argument that, as a matter of law, the slap was not disproportionate "to the misconduct being punished."

#### 1. *Stocker was a "parent" within the meaning of HRS § 703–309(1).*

Before addressing Stocker's arguments, we take up the preliminary question whether Stocker is a member of the class of persons who may take advantage of the parental discipline defense pursuant to HRS § 703–309(1). Granted, the uncontroverted evidence was that Stocker is Shane's biological father. However, it was further uncontroverted that Leiwalo had "full custody" of Shane and that Stocker retained only "visitation rights" pursuant to their divorce decree. The issue, therefore, is whether Stocker retained the right to invoke the parental discipline defense, pursuant to HRS § 703–309(1), under the circumstances.

HRS § 703–309(1) is fashioned after MPC § 3.08(1). *See* Hse. Conf. Comm. Rep. No. 1, in 1972 House Journal, at 1035 (noting that the HPC was "derivative of the Model Penal Code"). The language of MPC § 3.08(1) is the same as HRS § 703–309(1), as originally enacted.[7] Comment 1 to MPC § 3.08 ex-

---

(1) the actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor or a person

plains that "[t]his section provides justifications for the use of force against another in a number of special situations that have in common that *the person using force is vested with particular responsibility for the care, discipline[,] or safety of others.*" (Emphasis added.) Comment 2, which directly addresses MPC § 3.08(1), further explains that, "so long *as the person exercising parental authority* acts for the purpose of safeguarding or promoting the child's welfare (including the specific purpose of preventing or punishing misconduct), he is privileged under the Model Code unless he culpably creates *a substantial risk of the excessive injuries specified in Subsection (1)(b).*" (Emphases added.)

The foregoing commentary establishes that, in employing the term "parent" within the context of the justification defense, the drafters of the MPC contemplated a "parent" possessing the authority to safeguard or promote the child's "welfare." Bearing in mind this court's statutory obligation to interpret statutes in pari materia "with reference to each other," *see* HRS § 1–16, *supra* section II.B, we look to a key statute concerning child custody for guidance in determining whether Stocker possessed such authority. HRS § 571–2 (1993) defines "[l]egal custody" as

> the relationship created by the [family] court's [divorce] decree which imposes on the custodian the responsibility of physical possession of the minor and the *duty to protect, train, and discipline the minor*

and to provide the minor with food, shelter, education, and ordinary medical care, *all subject to residual parental rights and responsibilities* and the rights and responsibilities of any legally appointed guardian of the person.

(Emphases added). The same statute defines "[r]esidual parental rights and responsibilities" as "those rights and responsibilities remaining with the parent after the transfer of legal custody or guardianship of the person, *including, but not necessarily limited to,* the right to reasonable visitation, consent to adoption or marriage, and the responsibility for support." (Emphasis added.) Thus, pursuant to HRS § 571–2, the "custodial" parent normally has reserved to him or her the sole authority and duty to "discipline" a child. However, because the legislature has expressly clarified that such authority is "subject to residual parental rights and responsibilities," which, by its plain and unambiguous terms, are not exhaustively enumerated in HRS § 571–2, that statute leaves open the possibility that the authority to "discipline" a child may, in some form, survive the loss of "custody."[8]

In the matter before us, Stocker's uncontroverted testimony established that, pursuant to the divorce decree, he was accorded the right to "pick up" his children on Fridays and return them on Sundays.[9] We therefore must infer, consistent with Stocker's uncontroverted testimony, that he was also accorded the right to unsupervised visitation. The incident at issue occurred on a Friday. Ac-

---

acting at the request of such parent, guardian or other responsible person and:
 (a) the force is used for the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of his misconduct; and
 (b) the force used is not designed to cause or known to create a substantial risk of causing death, serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation[.]

8. The legislative history of HRS § 571–2 sheds no light on the outer limits of "residual parental rights and responsibilities." *See* Hse. Stand. Comm. Rep. No. 879, in 1965 House Journal, at 551 (noting only that the statute "embod[ies] new concepts as far as our laws are concerned, relating to residual parental rights and protective supervision").

9. We note that Stocker's testimony was not the best evidence of the provisions of his divorce decree. *See* HRE Rule 1002 (1993), entitled "Requirement of original" and otherwise known as the "original document rule," providing that, "[t]o prove a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute." However, the prosecution failed to object to Stocker's testimony regarding the contents of his divorce decree or to raise the issue in a cross-appeal. Accordingly, we do not reach the question of admissibility. *But see generally*, Addison M. Bowman, *Hawai'i Rules of Evidence Manual* §§ 1002–2 and 1002–2A at 599–600 (2d. ed.1998).

cordingly, Stocker met his burden of production to show that he was acting within the scope of his visitation rights.[10]

Thus narrowed, the issue is whether a non-custodial parent, acting within his court-prescribed unsupervised visitation time, retains as a "residual parental right," within the meaning of HRS § 571–2, the authority to discipline a child with respect to that child's conduct during the visitation period. We hold that he must. A contrary holding would lead to the absurdity that a non-custodial parent, alone with his child during an authorized visitation period, would be powerless to employ the use of force against the child, even if such force were reasonably necessary to "promote" the child's "welfare." "The legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction[,] and illogicality." *Lee*, at 138, 976 P.2d at 452 (quoting *Bautista*, 86 Hawai'i at 209, 948 P.2d at 1050–51 (quoting *Arceo*, 84 Hawai'i at 19, 928 P.2d at 861 (citation and internal quotation marks omitted))) (internal quotation marks omitted). Inasmuch as a judicially-conferred, unsupervised visitation period places the child beyond the control of the custodial parent during that period and directly —indeed, generally exclusively—in the non-custodial parent's care, the non-custodial parent *must* retain the authority to care for that child's safety and well-being during the period of visitation. Accordingly,

we hold that Stocker was a "parent" for purposes of HRS § 703–309(1).

#### 2. *We decline to overrule Crouser.*

■ Stocker asserts that, in *Crouser*, this court misconstrued the meaning of the phrase "reasonably related," as employed in HRS § 703–309(1)(a), *see supra* note 2. In *Crouser*, we noted that, as originally enacted, HRS § 703–309(1) required no showing of the reasonableness of a parent's use of force. 81 Hawai'i at 11–12, 911 P.2d at 731–32.

> In 1992, however, the statute was amended to require that, "[i]n determining whether or not the level of force used is permitted under law, a court must consider the age and size of the recipient and whether a *reasonable* relationship exists between the force used and a legitimate purpose as specified by the statute."

*Id.* at 11, 911 P.2d at 731 (quoting Hse. Conf. Comm. Rep. No. 103, in 1992 House Journal, at 843 (emphasis added)) (emphasis in original). We thus construed the "reasonableness" requirement as follows: "Although we have found no other statute employing the identical language, it seems clear that to be 'reasonably related' to the purpose of punishing misconduct, use of force must be both reasonably proportional to the misconduct being punished and reasonably believed necessary to protect the welfare of the recipient." *Id.* at 12, 911 P.2d at 732.

---

**10.** The defense of parental discipline, as set forth in HRS § 703–309(1), is not an affirmative defense. *Crouser*, 81 Hawai'i at 11, 911 P.2d at 731 (noting that, with respect to HRS § 703–309(1), "the prosecution had the burden of disproving beyond a reasonable doubt the justification evidence that was adduced, or proving beyond a reasonable doubt facts negativing the justification defense"). HRS § 701–115 (1993) provides in relevant part:

 **Defenses.** (1) A defense is a fact or set of facts which negatives penal liability.

 (2) No defense may be considered by the trier of fact unless evidence of the specified facts has been presented. If such evidence is presented, then:

 (a) If the defense is not an affirmative defense, the defendant is entitled to an acquittal if the trier of fact finds that the evidence when considered in light of any contrary prosecution evidence, raises a reasonable doubt as to the defendant's guilt[.]

Therefore, the defendant bears the initial burden of production with respect to the parental discipline defense; if the defendant satisfies that burden, the prosecution must then disprove the defense beyond a reasonable doubt. *Cf. Lee*, at 136–139, 976 P.2d at 450–53 (holding that a defendant in a prosecution for operation without no-fault insurance bears the initial burden of production with respect to the non-affirmative defense of self-insurance). To meet his initial burden of production, the defendant need only come forward with " 'some' evidence, 'no matter how weak, inconclusive, or unsatisfactory the evidence may be.' " *Id.* at 137, 976 P.2d at 451 n. 6 (quoting *State v. Maelega*, 80 Hawai'i 172, 179, 907 P.2d 758, 765 (1995) (quoting *State v. Nobriga*, 10 Haw.App. 353, 359, 873 P.2d 110, 113 (1994) (citing Commentary to HRS § 701–115 (1985)), and *State v. Pinero*, 75 Haw. 282, 304, 859 P.2d 1369, 1379 (1993) (citations and internal quotation marks omitted))) (original emphasis deleted).

Stocker argues (1) that our construction in *Crouser* of the phrase "reasonably related to the purpose of . . . punishment of the minor's misconduct" to include the requirement that the use of force be reasonably proportional to the misconduct was erroneous and (2) that the phrase "reasonably proportional," as employed in *Crouser*, was "vague and over broad." Although "the doctrine of stare decisis is subordinate to legal reasons and justice and we should not be unduly hesitant to overrule a former decision when to do so would bring about what is considered manifest justice," *Robinson v. Ariyoshi*, 65 Haw. 641, 654 n. 10, 658 P.2d 287, 298 n. 10 (1982) (quoting *McBryde Sugar Co. v. Robinson*, 54 Haw. 174, 180, 504 P.2d 1330, 1335, *aff'd on rehearing*, 55 Haw. 260, 517 P.2d 26 (1973), *appeal dismissed for want of jurisdiction and cert. denied*, 417 U.S. 962, 94 S.Ct. 3164, 41 L.Ed.2d 1135 (1974)), "a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." *Johnston v. KFC Nat'l Management Co.*, 71 Haw. 229, 233, 788 P.2d 159, 161 (1990) (internal quotation signals and citation omitted). Moreover,

> the burden borne by the party advocating the abandonment of an established precedent is greater where the Court is asked to overrule a point of statutory construction, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and [*the legislature*] *remains free to alter what we have done.*

*Patterson v. McLean Credit Union*, 491 U.S. 164, 172–73, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (citing *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 424, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 726, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977)) (emphasis added).

Aside from his bare assertion that our interpretation, in *Crouser*, of the statute was erroneous, Stocker offers nothing to demonstrate any default in *Crouser*'s reasoning. Furthermore, Stocker's argument that the *Crouser* interpretation was "vague and over broad" misapprehends the vagueness and overbreadth doctrines. Those doctrines refer to the language of a penal *statute* and

not to the analysis of an appellate decision construing that statute, no matter how (allegedly) ambiguous. *See State v. Richie*, 88 Hawai'i 19, 31, 960 P.2d 1227, 1239 (1998) (describing vagueness and overbreadth as challenges to the constitutionality of a statute) (citations omitted). Accordingly, we decline to overrule *Crouser*.

3. *The prosecution failed, as a matter of law, to negative Stocker's defense that his "use of force" was "reasonably related to the punishment" of Shane's "misconduct," within the meaning of HRS § 703–309(1)(a).*

We now address Stocker's core argument, *i.e.*, that insufficient evidence was adduced, as a matter of law, to disprove his parental discipline defense beyond a reasonable doubt. As we observed *supra* in note 10, Stocker bore the initial burden of production with respect to the facts necessary to put the parental discipline defense at issue. That being the case, the defense was available to Stocker so long as *some* evidence was adduced, "no matter how weak, inconclusive, or unsatisfactory" it might be, *see Lee*, at 137, 976 P.2d at 451 n. 6; *State v. Maelega*, 80 Hawai'i 172, 179, 907 P.2d 758, 765 (1995); *State v. Nobriga*, 10 Haw.App. 353, 359, 873 P.2d 110, 113 (1994), which was probative of the facts that (1) Stocker had parental authority over Shane, *see supra* section III.B.1, (2) the force at issue was "employed with due regard for the age and size of the minor," *see* HRS § 703–309(1)(a), and (3) the force was "reasonably proportional to the misconduct being punished and reasonably believed necessary to protect the welfare of the recipient," *see supra* section III.B.2. The evidence in the present matter, as the family court itself expressly characterized it, established that (1) Stocker had parental authority over Shane, an eleven-year-old boy, (2) Shane refused to come to Stocker when called, and (3) Stocker slapped him in the face. Accordingly, Stocker met his burden of production regarding the parental discipline defense, and the burden then shifted to the prosecution to disprove the defense beyond a reasonable doubt.

96

■ The family court stated unambiguously in its oral findings that the "only hang up" it harbored with respect to "the difficult question" posed by Stocker's defense, which it acknowledged might "have to [be] resolved in the appellate courts," centered on the "proportionality" of the slap to the "misconduct." In other words, the family court determined that "a slap across the face" was not "reasonably proportional" to Shane's "misconduct." We hold that the family court's finding is unsupported by substantial evidence.

The *only* evidence upon which the family court could have based its finding derived from Shane's testimony. In this regard, Shane testified that (1) Stocker slapped him as a result of his failure to come to him after several commands,[11] and (2) the slap (a) was "with an open hand," (b) "didn't hurt ... only hurt a little," and (c) left no mark or bruise. Accordingly, even viewing the evidence in the light most favorable to the prosecution, the inference is inescapable, the use of force being legally justifiable—by legislative mandate—in the context of parental discipline, that the slap did not constitute an unreasonable, excessive, or disproportionate use of force. The family court's view to the contrary appears to have rested on its determination that, on the record before it, *any* slap to the face—no matter how mild—would, as a *per se* matter, have been disproportionate to Shane's misconduct. Although there was no apparent danger to Shane at the time, we cannot agree with the family court's assessment, that, as a matter of law, a single, mild slap to the face is not "reasonably proportional" to a child's refusal to come when repeatedly directed to do so. Although, as this court noted in *Crouser*, the legislature's 1992 amendments to HRS § 703–309(1) accorded the courts greater leeway to determine the parameters of permissible parental discipline, they did not eradicate a parent's prerogative to apply mild force to punish a child's minor misconduct.

## IV. *CONCLUSION*

We emphasize that our opinion today should not in any way be construed as an expression of approval of the parental conduct that precipitated the prosecution of the matter before us. Neither should our opinion be viewed as an endorsement, of any kind, of the use by parents of corporal punishment of their children. It is common knowledge that the utility—not to mention the simple humanity—of corporal punishment as a parental tool is the subject of considerable controversy within American society. Nevertheless, it is equally obvious that the permissibility of corporal punishment reflects a societal judgment that falls well within the parameters of legitimate and constitutional legislative policy-making. In this regard, the legislature has expressed its judgment, for better or for worse, through the parental discipline defense, as enacted in HRS § 703–309(1). What, in its wisdom, the legislature has codified, it is free to amend or repeal. But as long as HRS § 703–309(1) remains the law of this state, we are bound to construe and enforce it.

Based on the forgoing reasoning, we reverse the judgment, guilty conviction, and sentence of the family court.

---

11. In this connection, the prosecution urges this court to consider Stocker's unsworn, post-verdict statement to the family court that "if I slapped him, it was probably just—I don't think it was for—out of discipline.... It was more of a play-

ful ... kind of thing." However, inasmuch as the issue on appeal is the sufficiency of the evidence adduced *at trial,* no statement by *any* witness made afterwards is relevant to our determination.