978 P.2d 693

STATE of Hawai'i, Respondent–Appellee,

v.

Dominick Joseph MATTIELLO,
Petitioner–Appellant.

No. 21187.

Supreme Court of Hawai'i.

March 16, 1999.

Linda C.R. Jameson, Deputy Public Defender, on the briefs, for the petitioner-appellant Dominick Joseph Mattiello.

Bryan K. Sano, Deputy Prosecuting Attorney, on the briefs, for the respondent-appellee State of Hawai'i.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by LEVINSON, J.

On March 2, 1999, we granted the petitioner-appellant Dominick Joseph Mattiello's application for a writ of certiorari to review the Intermediate Court of Appeals' (ICA) memorandum opinion in *State v. Mattiello*, 91 Hawai'i 139, 980 P.2d 1013 (App.1999) (hereinafter, the "ICA's majority opinion"). In his application, Mattiello argues that the ICA's majority opinion was erroneous in holding that the prosecution had adduced evidence that Mattiello knowingly distributed "[t]hree eights ounce or more" of a "dangerous drug" sufficient to support his conviction of promoting a dangerous drug in the first degree, in violation of Hawai'i Revised Statutes (HRS) § 712–1241(1)(b)(ii) (B)(1993).[1] Mattiello urges this court to adopt the reasoning of

---

1. At the time of the alleged offense, HRS § 712–1241 provided in relevant part:

    **Promoting a dangerous drug in the first degree.** (1) A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:

. . .

(b) Distributes:

. . .

(ii) One or more preparations, compounds, mixtures, or substances of an aggregate weight of:

Judge Acoba's opinion dissenting from the ICA's majority opinion (hereinafter, the "dissent"), which would have held, pursuant to HRS §§ 712–1240 (1993)[2] and 712–1241(1)(b)(ii)(B), that where the dangerous drugs that are the subject of a charge are in liquid form, the prosecution must adduce substantial proof of: (1) a measurement of the liquid in fluid ounces; and (2) "the standard measurements required for converting volume to mass," in order for the jury to convert the fluid ounces measurement to the avoirdupois weight of the drug mixture.

We agree with Mattiello and Judge Acoba that the ICA's majority opinion was erroneous. However, in contrast to the dissent, we hold that, to satisfy the requirements of HRS §§ 712–1240 and 712–1241(1)(b)(ii)(B), the prosecution need only adduce evidence of the measurement in *fluid ounces* of dangerous drugs distributed in liquid form. The jury need not and should not then attempt to convert that figure to an avoirdupois weight. Because insufficient evidence was adduced of the measurement in fluid ounces of the dangerous drug involved in the present case, we vacate the circuit court's judgment, guilty conviction, and sentence and remand to the circuit court for the entry of a judgment convicting Mattiello of, and sentencing him for, promoting a dangerous drug in the *second* degree, in violation of HRS § 712–1242(1)(c) (1993).[3]

## I. BACKGROUND

Mattiello was charged, by way of an amended complaint filed on December 3, 1996, with one count of promoting a harmful drug in the first degree, in violation of HRS § 712–1244(1)(c) (1993) (Count I),[4] and one count of promoting a dangerous drug in the first degree, in violation of HRS § 712–1241(1)(b)(ii)(B) (Count II). After a jury trial, Mattiello was acquitted of Count I. The present appeal concerns Count II.

At trial, Kelly Mayne and Diane Milner, two undercover investigators of the State of Hawai'i, Department of Public Safety, Narcotics Enforcement Division, testified that they had purchased methadone from Mattiello at a Jack in the Box restaurant in Honolulu on March 1, 1996. The investigators had previously arranged to purchase methadone from Mattiello on February 27, 1996; however, no sale occurred on that date because Mattiello did not arrive on time for the meeting, and an opportunistic competitor intervened to sell the investigators methadone. After Mattiello arrived to find his sale canceled, the investigators agreed to meet with him at the restaurant on March 1 in order to purchase methadone.

(A) One-eighth ounce or more, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers; or
(B) Three-eighths ounce or more, containing any other dangerous drug[.]
HRS § 712–1241 has subsequently been amended twice, in respects immaterial to the present appeal. *See* 1996 Haw. Sess. L. Act 308, § 2 at 970–71; 1997 Haw. Sess. L. Act 319, § 2 at 762.

2. HRS § 712–1240 provides in relevant part:
   **Definitions of terms in this part.** In this part, unless a different meaning is plainly required:
   "Dangerous drugs" means any substance or immediate precursor defined or specified as a "Schedule I substance" or a "Schedule II substance" by chapter 329, except marijuana or marijuana concentrate.
   . . . .
   "Ounce" means an avoirdupois ounce as applied to solids and semi-solids, and a fluid ounce as applied to liquids.

HRS § 329–16(c)(16) (Supp.1995) lists morphine as a "Schedule II" substance. HRS § 329–16 has been amended once since the time of the alleged offense, in respects immaterial herein. *See* 1997 Haw. Sess. L. Act 356, § 2 at 1119–20.

3. At the time of the alleged offenses, HRS § 712–1242 provided in relevant part that "[a] person commits the offense of promoting a dangerous drug in the second degree if the person knowingly: . . . [d]istributes any dangerous drug in any amount." HRS § 712–1242 has subsequently been amended once, in respects immaterial herein. *See* 1996 Haw. Sess. L. Act 308, § 3 at 971.

4. HRS § 712–1244 provides in relevant part that "[a] person commits the offense of promoting a harmful drug in the first degree if the person knowingly: . . . [d]istributes twenty-five or more capsules or tablets or dosage units containing one or more of the harmful drugs or one or more of the marijuana concentrates, or any combination thereof[.]"

Milner described the March 1, 1996 sale as follows:

A. ... [Mattiello] came at approximately 10:30, maybe a minute or two after that, and I saw [Mattiello] arriving outside, and that's when I went outside and met with him. He asked me if I had ... the bottle and [if] I had money.

He explained that he'd come straight from the clinic and he had to keep his bottle, that he didn't bring the bottle with him to do the transfer, that he had not transferred the methadone into another container yet, and I told him I did have a container, that I would have to go in the restaurant and get it. That's when I went into the restaurant momentarily.

Q. What happened then?

A. I got this container that I had brought from my office, sterile container that we had brought purposely for this investigation. I brought it outside and met with ... Mattiello.

At that time, he removed from his left front pocket a bottle and gave it to me, told me to take it into the restaurant and go to the restroom, transfer the content[s] to my bottle, and he explained that I needed to shake the contents first before I poured it into my bottle to make sure I got all of the contents because this particular product separates—and he called it wafers—that separates.

*He claimed that* he had not tampered with it, that *there were a full 90 milliliters within this container* [5] that he was offering me to transfer into my container.

Q. Did ... Mattiello tell you how much this would cost?

A. Yes. He changed the price. Originally, the day before, he had told me $90. He told me it was going to be a hundred dollars.

(Emphasis added.) Milner proceeded to the restroom, where she shook up the container provided to her by Mattiello and poured the liquid into her container. The bottle contained "a solid matter sort of suspended in a

liquid matter and falling through it ... settling on the bottom." She then returned to the restaurant, found Mattiello, and returned his bottle to him with the requested $100.00.

Julie Wood, a criminalist, testified that she tested the substance in the bottle that Milner had obtained from Mattiello. As a result of the tests she performed, she concluded that the bottle contained methadone. She determined the amount of the substance as follows:

Q. Did you ... weigh the content[s] of the bottle ... ?

A. Yes, I did.

Q. How did you go about weighing the content[s] of the bottle?

A. I took a glass beaker, put it on the balance ... or scale, whichever you want to call it—and obtained the weight of the beaker, then zeroed the balance so the face of the balance, the electronic balance, reads zero. At that point, you've substantially subtracted the weight of [the] beaker. Then I pour the liquid into the beaker and record that final weight.

Q. What was the weight that you recorded?

A. *The weight was 40.906 grams.*

Q. And is that greater than three-eighths of an ounce?

A. Yes.

Q. Three-eighths. In terms of ounces, is that greater than an ounce?

A. Yes, it is.

Q. *An ounce is about how much in grams?*

A. *An ounce is 28.35 grams.*

(Emphases added.) On cross-examination, Wood admitted that she could not "tell whether the methadone started out in liquid or solid form when it was given as a prescription" and that she did not know what form methadone generally takes when prescribed. She also admitted that she could not tell whether the substance in the bottle was a suspension, which she defined as "a liquid [with] particles that are freely floating

---

5. On cross-examination, Milner admitted that Mattiello had referred to the amount in "mills" and quoted the price for the substance to her as

"a dollar a mill," rather than expressly referring to "mill*iliters.*"

around," or a "definite solid separate from [the] liquid." Wood never attempted to measure the solid and liquid portions of the bottle's contents separately.

At the close of the prosecution's case-in-chief, Mattiello orally moved for a judgment of acquittal on both counts. With regard to Count II, he argued that there was insufficient evidence that the amount of the methadone was "three eighths ounce or more." The circuit court denied the motion.

Mattiello testified in his own defense, *inter alia*, that, as a patient in a methadone maintenance program, he received two forty-milligram tablets of methadone per day. He was instructed to dissolve the tablets in hot water before ingesting them. He admitted to selling the methadone to Milner, but denied ever having referred to the drug in terms of "milliliters," claiming that, when he had used the term "mills," he was referring to "milligrams."

On August 28, 1997, the jury found Mattiello guilty of Count II. The circuit court's judgment, guilty conviction, and sentence was filed on November 25, 1997. Mattiello's timely notice of appeal was filed on December 9, 1997.

On appeal, Mattiello argued, *inter alia*, that the prosecution had adduced insufficient evidence that he had distributed "three eighths ounce or more" of methadone, noting that Wood had never weighed the solid portion of the methadone separately from the liquid. The ICA's majority opinion addressed the argument in relevant part as follows:

> ... HRS § 712–1240 (1993) defines "ounce" as "an avoirdupois ounce as applied to solids and semi-solids, and a fluid ounce as applied to liquids." Under this definition, solids and semi-solids[6] are measured by weight and liquids are measured by volume. Since HRS § [ ]712–1241(1)(b)(ii) prohibits [distribution] of "mixtures ... of an aggregate weight of ... [t]hree-eighths ounce or more," it either (a) does not apply to liquid mixtures or (b) contradicts the definition of ounce in

HRS § 712–1240 and authorizes all mixtures to which it refers–of liquids, solids, and/or semi-solids–to be measured by weight. There being no indication whatsoever that (a) is true, we conclude that (b) is true.

ICA's majority opinion at 17 (some brackets added and some in original).

In his dissent, Judge Acoba noted that

> [w]eight is defined as "a unit of weight or mass[.]" *Webster's Third New International Dictionary* 2595 (1981) [hereinafter *Webster's* ]. "Avoirdupois" refers to "[t]he name of a system of weights (sixteen ounces to the pound) used in weighing articles other than medicines, metal, and precious stones...." *Black's Law Dictionary* 136 (6th ed.1990) (emphasis added). A fluid ounce, on the other hand, is defined as a "unit[ ] of liquid capacity[.]" *Webster's*, supra, at 877.

Dissent at 6. Because Wood had clearly expressed her measurement of the substance in the bottle in terms of grams and had testified that "[a]n ounce is 28.35 grams," the dissent inferred that she had employed the avoirdupois method of measurement. *Id.* (noting that 28.35 grams is the equivalent of one *avoirdupois* ounce) (citing *The Random House College Dictionary* Table of "Metric and United States Equivalents" (Rev.1984)). Moreover, the dissent noted that

> [t]he only "solid" substances under the evidence were the two methadone pills, each weighing 40 milligrams, for a total of 80 milligrams. "[A] milligram is a metric unit of mass and weight equal to 1/1000 grams." *Webster's*, *supra*, at 1435. As Wood indicated, twenty-eight and thirty-five hundredths (28.35) grams equal an avoirdupois ounce. Ten and sixty-three hundredths (10.63) grams would equal three-eighths of such an ounce. Eighty milligrams would equal eight hundredths (.08) grams. The methadone pills, then, would weigh less than three-eighths of an avoirdupois ounce.

Dissent at 7–8.

Like the ICA's majority opinion, the dissent perceived a mutual exclusivity between

---

6. "Webster's Third New International Dictionary (1981) defines 'semi-solid' as 'a substance that has the qualities of both a solid and a liquid but more closely related to a solid.' Examples provided are jelly and paste." ICA's majority opinion at 17 n. 3.

the language in HRS § 712–1241(1)(b)(ii)(B), which prescribes distribution of, *inter alia*, a "mixture" containing a dangerous drug of "an aggregate *weight*". of "three eighths ounce or more," and HRS § 712–1240, which defines "ounce," when employed to describe liquids, as a measure of volume ("fluid ounce") rather than of weight. *Id.* at 9. In order to reconcile the two statutes, the dissent proposed that the prosecution be required to adduce proof of the volume, density, and mass of the substance in question, so that the jury could itself convert a liquid ounce measure into an avoirdupois weight. *Id.* at 10. In addition, the prosecution would be required to adduce evidence of the "standard measurements required for converting volume to mass or vice-versa and/or the formula for making such a conversion" through expert testimony, inasmuch as "these matters are [not] of such general lay knowledge that the jury could be assumed to have performed the conversion, or to have had at hand the standard measures to do so without additional evidence." *Id.* at 10–11. Because the prosecution had failed to proffer such evidence with respect to the liquid methadone mixture in the present case, the dissent concluded that insufficient evidence had been adduced to convict Mattiello of promoting a dangerous drug in the first degree. *Id.* at 11. The dissent further noted that, because the jury had never been instructed as to the definition of "ounce," the jury instructions were prejudicially insufficient. *Id.* at 11 n. 7.

Mattiello's timely application for a writ of certiorari was filed on March 1, 1999.

## II. *STANDARD OF REVIEW*

### A. *Sufficiency Of The Evidence*

"[V]erdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the [trier of fact's] findings." *Tsugawa v. Reinartz*, 56 Haw. 67, 71, 527 P.2d 1278, 1282 (1974). We have defined "substantial evidence" as "credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion." *See, e.g., In re Doe, Born on January 5, 1976*, 76 Hawai'i 85, 93, 869 P.2d 1304, 1312

(1994) (citations omitted) (brackets in original).

*Aga v. Hundahl*, 78 Hawai'i 230, 237, 891 P.2d 1022, 1029 (1995). "[I]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the [trier of fact]." *State v. Buch*, 83 Hawai'i 308, 321, 926 P.2d 599, 612 (1996) (citation omitted). "We have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction." *State v. Batson*, 73 Haw. 236, 248, 831 P.2d 924, 931 (1992), *reconsideration denied*, 73 Haw. 625, 834 P.2d 1315 (1992) (citations omitted).

*State v. Stocker*, 90 Hawai'i 85, 90, 976 P.2d 399, 404 (1999) (quoting *State v. Lee*, 90 Hawai'i 130, 134, 976 P.2d 444, 448 (1999) (quoting *State v. Bautista*, 86 Hawai'i 207, 210, 948 P.2d 1048, 1051 (1997)) (some brackets in original and some added)).

### B. *Interpretation Of A Statute*

"[T]he interpretation of a statute ... is a question of law reviewable *de novo*." *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara*, 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura*, 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa*, 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied*, 79 Hawai'i 341, 902 P.2d 976 (1995); *State v. Nakata*, 76 Hawai'i 360, 365, 878 P.2d 699, 704, *reconsideration denied*, 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

*Gray v. Administrative Director of the Court*, 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto*, 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect

to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists....

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1983) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray,* 84 Hawai'i at 148, 931 P.2d at 590 (quoting *State v. Toyomura,* 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993). *Stocker,* at 90–91, 976 P.2d at 404–05 (quoting *Ho v. Leftwich,* 88 Hawai'i 251, 256–57, 965 P.2d 793, 798–99 (1998) (quoting *Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawai'i 217, 229–30, 953 P.2d 1315, 1327–28 (1998))).

## III. *DISCUSSION*

The dispositive question is whether the ICA's majority opinion correctly construed the interaction between HRS §§ 712–1240, *see supra* note 2, and 712–1241(1)(b)(ii)(B), *see supra* note 1. We hold that it did not.

The ICA's majority opinion appears to reason that: (1) because HRS § 712–1241(1)(b)(ii)(B) refers to "mixtures" of a "weight" of "three-eighths ounce," and (2) a "fluid ounce" is a measure of volume and not of weight, therefore (3) the definition of "ounce" as set forth in HRS § 712–1240 does not apply to HRS § 712–1241(1)(b)(ii)(B). Therefore, according to the ICA's majority opinion, for purposes of HRS § 712–1241(1)(b)(ii)(B), all materials containing dangerous drugs—whether in solid, semi-solid, or liquid form—must be measured according to their avoirdupois weight.

None of the commonly understood meanings of the terms "preparation," "compound," "mixture," or "substance" require or necessarily imply that the material described be in a particular form. In other words, a "preparation," "compound," "mixture," or "substance" might be in liquid, solid, or semi-solid form. *See The Random House Dictionary of the English Language Unabridged* 1527 (defining "preparation" in relevant part as "something prepared, manufactured, or compounded"), 420 (defining "compound" in relevant part as "a pure substance composed of two or more elements whose composition is constant"), 1234 (defining "mixture" in relevant part as "an aggregate of two or more substances that are not chemically united and that exist in no fixed proportion to each other"), 1897 (defining "substance" in relevant part as "a species of matter of definite chemical composition") (2d. ed.1983). Accordingly, statutory use of these terms, in and of itself, does not reflect a legislative intent that the provisions of HRS § 712–1241(1)(b)(ii)(B) should trump the definition of "ounce," as set forth in HRS § 712–1240.

On the other hand, in our view, the ICA's majority opinion is correct that the legislature's use of the term "weight" implies an avoirdupois ounce rather than a liquid ounce, because the latter is not a measure of weight. Thus, the juxtaposition of the words "weight" and "ounce" in HRS § 712–1241(1)(b)(ii)(B) injects some ambiguity into the meaning of the term "ounce."

Importantly, however, the ICA's majority opinion fails to note that the phrase "preparations, compounds, mixtures, or substances of an aggregate weight" appears in *every* statute in which the term "ounce" is em-

ployed in HRS ch. 712 pt. IV, entitled "Offenses Related to Drugs And Intoxicating Compounds." *See* HRS §§ 712–1241(1)(a) (promoting a dangerous drug in the first degree), 712–1242(1)(b) (1993) (promoting a dangerous drug in the second degree), 712–1244(1)(b) and (d) (1993) (promoting a harmful drug in the first degree), 712–1245(1)(b) (promoting a harmful drug in the second degree), 712–1247(1)(b), (d), and (f) (1993) (promoting a detrimental drug in the first degree), and 712–1248(b) (1993) (promoting a detrimental drug in the second degree).

HRS § 712–1240 expressly provides that the definitions set forth in that section apply to all statutes within part IV "unless a different meaning is plainly required." *See supra* note 2. Pursuant to the interpretation of the ICA's majority opinion, the definition of "ounce," as set forth in HRS § 712–1240, would *never* apply to liquids, and a weight in avoirdupois ounces would *always* be "plainly required."

> A fundamental principle of statutory construction is that "courts are bound to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute."

*Gatri v. Blane*, 88 Hawai'i 108, 114, 962 P.2d 367, 373 (1998) (quoting *State v. Ganal*, 81 Hawai'i 358, 372, 917 P.2d 370, 384 (1996) (citation omitted)). *See also State v. Bautista*, 86 Hawai'i 207, 213, 948 P.2d 1048, 1054 (1997); *State v. Mitsuda*, 86 Hawai'i 37, 41, 947 P.2d 349, 353, *reconsideration denied*, 86 Hawai'i 37, 947 P.2d 349 (1997). Inasmuch as the ICA's majority opinion renders the definition of the term "ounce," as set forth in HRS § 712–1240, surplusage, we reject its interpretation.

The dissent attempted to harmonize HRS §§ 712–1240 and 712–1241(1)(b)(ii)(B) by (1) requiring the prosecution to adduce evidence of the volume, mass, and density of the mixture, as well as standard conversion formulae

and (2) requiring the jury, presumably, to derive from that evidence *both* a measurement in volume (fluid ounces) and in weight (avoirdupois ounces). The dissent's approach has the merit of fully "preserving" the meaning of the 'term "weight," as employed in HRS § 712–1241(1)(b)(ii)(B), and the definition of "ounce," as set forth in HRS § 712–1240. However, it does so at the price of producing an unnecessarily complex approach to proving a statutory element—the quantity of the substance containing the dangerous drug—that is clearly intended to be uncomplicated. We do not believe that the legislature intended to impose such an onerous and unnecessary task upon the trier of fact.

■ In order to avoid an absurd result, *see Lee*, 90 Hawai'i at 138, 976 P.2d at 452, we hold that, notwithstanding the use of the terms "mixture" and "weight" in HRS § 712–1241(1)(b)(ii)(B), dangerous drugs distributed in liquid form must be measured in fluid ounces. In other words, HRS § 712–1241(1)(b)(ii)(B) proscribes distribution, in the amount of three-eighths or more of a *fluid* ounce, of a liquid preparation, compound, mixture, or substance containing dangerous drugs.[7]

■ As the dissent points out, the only evidence of the weight of the solid portion of the contents of the bottle sold to Milner came from Mattiello's statements. He testified that the bottle contained two forty-gram tablets. However, Mattiello also testified that when he had originally quoted Milner a price of a "dollar a mill," *see supra* note 5, he had meant to refer to milligrams. Inasmuch as his original price was ninety dollars, the jury might have believed that he had admitted that there were ninety milligrams of methadone in solid form. However, that amount would still only total nine-hundredths (.09) of a gram—less than the ten and sixty-three hundredths (10.63) grams necessary for a violation of HRS § 712–1241(1)(b)(ii).

---

7. We realize that the foregoing construction of the statute does not accord the word "weight" its common meaning in every application. For example, where, as here, the substance is in liquid form, the term weight in HRS § 712– 1241(1)(b)(ii)(B) must be construed to mean "weight or volume." We deem our construction to be preferable to one that completely excises the definition of "ounce," as set forth in HRS § 712–1240.

With regard to the liquid mixture,[8] if the jury instead believed that Mattiello had employed the term "mill" to refer to milliliters, it could have concluded that the bottle contained ninety milliliters. However, no evidence was adduced regarding the conversion of milliliters to fluid ounces. We agree with the dissent that such a conversion is not "of such general lay knowledge that the jury could be assumed to have performed the conversion, or to have had at hand the standard measurements required to do so without additional evidence."[9] Dissent at 10–11. Moreover, we also agree with the dissent that the fact that the circuit court failed to instruct the jury as to the correct definition of "ounce" renders it even more unlikely that the jury performed the required calculation by itself.

Accordingly, we hold that the prosecution adduced insufficient evidence that the amount of the methadone mixture sold by Mattiello was "three-eighths ounce or more." Because, however, there was substantial evidence that Mattiello distributed methadone "in any amount," we remand for entry of conviction of the lesser included offense of promoting a dangerous drug in the second degree, in violation of HRS § 712–1242(1)(c). *See State v. Wallace,* 80 Hawai'i 382, 414–15, 910 P.2d 695, 727–28 (1996); *State v. Malufau,* 80 Hawai'i 126, 134, 136, 138, 906 P.2d 612, 620, 622, 624 (1995).

## IV. *CONCLUSION*

Based on the foregoing analysis, we reverse the ICA's majority opinion, vacate the circuit court's judgment, guilty conviction, and sentence, and remand to the circuit court for the entry of a judgment of conviction of and sentence for promoting a dangerous drug in the second degree, in violation of HRS § 712–1242(1)(c).

---

8. We note that it is immaterial what portion of the mixture was methadone and what was water or some other substance, inasmuch as HRS § 712–1241(1)(b)(ii) does not differentiate as a function of purity. *See State v. Reed,* 77 Hawai'i 72, 85–86, 881 P.2d 1218, 1231–32 (1994).

9. While the foregoing proposition may not be true for conversions performed more commonly in everyday life, such as the conversion from avoirdupois ounces to pounds, we expect that few among us could be expected independently to recall that there are 29.573 milliliters in a fluid ounce. *See The Random House Dictionary of the English Language Unabridged* 739 (2d. ed.1983) (defining "fluid ounce"). We note that, had such evidence been adduced, there would have been sufficient evidence to support Mattiello's conviction, inasmuch as three-eighths of 29.573 milliliters is equal to 11.09 milliliters, and Mattiello admitted to selling a mixture of ninety milliliters.