**Electronically Filed
Supreme Court
SCWC-19-0000697
15-MAR-2023
11:44 AM
Dkt. 24 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

PAOLA IBARRA,
Petitioner/Defendant-Appellant,

and

GUSTAVO FERREIRA,
Respondent/Co-Defendant-Appellee.

_____

SCWC-19-0000697

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-19-000697; 1CPC-17-0001646)

MARCH 15, 2023

McKENNA, WILSON, AND EDDINS, JJ., AND
RECKTENWALD, C.J., DISSENTING, WITH WHOM NAKAYAMA, J., JOINS

OPINION OF THE COURT BY WILSON, J.

## I. INTRODUCTION

This case arises from Petitioner/Defendant-Appellant Paola Ibarra's ("Ibarra") jury conviction for promoting prostitution in violation of Hawai'i Revised Statutes ("HRS") §

712-1203(1) (2016).[1,2]  After the jury returned its verdict of guilty, Ibarra filed a motion for judgment of acquittal, or in the alternative, for a new trial, that was denied.  At issue is whether a reasonable juror could have concluded that Ibarra "profit[ed] from prostitution" within the meaning of HRS § 712-1201 (2016).[3]

Because there was insufficient evidence that the defendant gained some benefit or value from another's prostitution activity, we reverse the circuit court's judgment of conviction and the ICA's judgment on appeal affirming the conviction.

---

[1]      The versions of the statutes applicable to this case are those that went into effect in October 2017 (incorporating amendments from 2016).

[2]      HRS § 712-1203(1) (2016) provides: "A person commits the offense of promoting prostitution if the person knowingly advances or profits from prostitution."

[3]      HRS § 712-1201 (2016) provides:

(1) A person "advances prostitution" if, acting other than as a prostitute or a patron of a prostitute, the person knowingly causes or aids a person to commit or engage in prostitution, procures or solicits patrons for prostitution, provides persons for prostitution purposes, permits premises to be regularly used for prostitution purposes, operates or assists in the operation of a house of prostitution or a prostitution enterprise, or engages in any other conduct designed to institute, aid, or facilitate an act or enterprise of prostitution.

(2) A person "profits from prostitution" if, acting other than as a prostitute receiving compensation for personally-rendered prostitution services, the person accepts or receives money or other property pursuant to an agreement or understanding with any person whereby the person participates or is to participate in the proceeds of prostitution activity.

## II.  BACKGROUND

### A.  Circuit Court Proceedings

#### 1.  Charges

On November 15, 2017, the State charged Ibarra and co-defendant Gustavo Ferreira ("Ferreira") with sex trafficking in violation of HRS § 712-1202(1)(a) and kidnapping in violation of HRS § 707-720(1)(e).

#### 2.  Jury Trial

At trial, both Ibarra and the complaining witness ("CW") testified that they flew from Oakland, California to Honolulu, Hawai'i together on October 31, 2017.[4]  Ibarra paid for her own and CW's airfare.  Once in Hawai'i, Ibarra and CW stayed in hotel rooms in Waikiki together, which Ibarra also paid for.

CW testified that it was her understanding that she and Ibarra were going to Hawai'i to "strip and dance" and that CW was going to repay Ibarra for her share of the airfare and hotel rooms as CW made money while in Hawai'i.  Ibarra testified that CW characterized the trip as a "paycation[,]" meaning that they were on vacation but still getting paid.  Samantha King

---

[4]    CW testified that the reason her and Ibarra planned the trip to Hawai'i was because CW reached out to Ibarra after seeing Instagram posts of Ibarra in Hawai'i.  CW explained that she asked Ibarra to take her along next time Ibarra went to Hawai'i.  CW further testified that she "had an idea" that Ibarra was involved in prostitution when she reached out to Ibarra.
    The dissent states that "CW and Ibarra arranged over Instagram to travel together to Hawai'i[,]" but omits the detail that it was CW who reached out to Ibarra on Instagram in order to initiate the trip to Hawai'i.

("King"), a long-time friend of CW's, testified that CW was "fully" aware that she was going to Hawai'i to engage in prostitution, and not just to strip and dance.

After arriving in Hawai'i, Ibarra paid for and posted prostitution advertisements for her and CW on a website called Backpage. Ibarra took photographs of CW, and CW took photographs of Ibarra for the advertisements. Each of the advertisements indicated that it was for a "two-girl special." Calls from potential customers would go to Ibarra and CW's cell phones individually. CW came to Hawai'i with two cell phones and had control over both at all times. CW testified that she set the prices for her own prostitution dates. Ibarra testified that she and CW would go on prostitution dates together for safety, but that she and CW would not engage in sexual acts with a customer together. CW testified that she and Ibarra participated in sexual acts together on "maybe two or three" prostitution dates.

Ibarra testified that she and co-defendant Ferreira had an intermittent romantic relationship. Ibarra explained that they broke up in mid-September of 2017 when Ferreira discovered that Ibarra engages in prostitution, and that they were not "boyfriend, girlfriend" at the time of the trip to Hawai'i.

Ferreira joined Ibarra and CW in Hawai'i on November 3, 2017.  CW testified that between October 31 and November 2, it was her choice to answer her phone, to make dates, set prices, and engage in sexual acts for money.  CW further testified that she was not scared of Ibarra and that she had a good time in Hawai'i when it was just her and Ibarra.  However, CW stated that "the vibe chang[ed]" when Ferreira arrived.[5]

CW testified that before Ferreira arrived, she gave Ibarra all of the money that she made from engaging in prostitution activities because "[n]ot only did [Ibarra] ask, but it only felt right because [Ibarra] had paid [CW's] way to come to Hawai'i."[6]  After Ferreira arrived, CW testified that she gave all of the money that she made from prostitution activities directly to Ferreira.  According to Ibarra, Ibarra told CW that Ibarra would front the costs of the trip, and that CW "would just pay [Ibarra] back once [CW] made the money."  Ibarra further testified that CW did not give Ibarra money that CW made

---

[5]     CW testified that she witnessed Ferreira "slapping [Ibarra] around" a few times and "slamming her on the ground" while in Hawai'i.  Ibarra testified that Ferreira never hit her.
    CW also stated that there was "more pressure" to go on prostitution dates after Ferreira arrived, but "[n]ot necessarily force."

[6]     The dissent states that "CW attested that though there was no agreement, she paid Ibarra because she felt obligated."  It is important to note that it was not Ibarra's behavior that made CW feel obligated to repay her.  Rather, CW testified that if she chose not to repay Ibarra, she would have "[b]een greedy" and that she "gave [Ibarra] the money because [she] thought that was right[.]"

from prostitution activities "[o]ther than what...our arrangement was[.]"

### 3. Verdict

On October 22, 2018, the jury returned a verdict of guilty against Ibarra for the lesser included offense of promoting prostitution in violation of HRS § 712-1203(1). The jury found Ferreira not guilty on all charges.

### 4. Ibarra's Motion for Judgment of Acquittal, or in the alternative, Motion for New Trial Is Denied

On October 30, 2018, Ibarra filed a motion for judgment of acquittal, or in the alternative, a motion for new trial. As noted, in order to be convicted of promoting prostitution under HRS § 712-1203(1), a person must "knowingly advance[] or profit[] from prostitution." Ibarra argued that she cannot be convicted of promoting prostitution under HRS § 712-1203 because she neither advanced nor profited from CW's prostitution.

Ibarra noted that the definition of "advances prostitution" in HRS § 712-1201(1) excludes a person that is "acting as a prostitute" themself from being found guilty. Ibarra argued that she was acting as a prostitute herself at all times, and thus cannot be convicted of advancing the prostitution of CW. That is, "[t]he taking of the photographs, the preparation of advertisements [], the posting of the

advertisements [], the accompaniment on the prostitution dates, [and] the prostitution dates all involved [] Ibarra, as well as CW [], acting as prostitutes."

Ibarra also contended that she did not "profit from prostitution" as defined in HRS § 712-1201(2) because the money she received from CW was for reimbursement only.

Finally, Ibarra pointed to the legislative history of HRS §§ 712-1201 and 712-1203 reflecting that the legislature was intending to target those who benefit the most from prostitution, such as sex traffickers and pimps, not prostitutes themselves. Ibarra noted that CW "confirmed that she voluntarily and willingly engaged in prostitution, . . . that Ibarra did not use force, threats, fraud or intimidation" and that CW "never told Ibarra that she did not want to engage in prostitution[.]"

The circuit court denied Ibarra's motion for judgment of acquittal, or in the alternative, motion for new trial. The circuit court agreed that Ibarra was barred from conviction for promoting prostitution under the "advancement" alternative pursuant to HRS § 712-1201(1). The circuit court concluded that "the definition of advances prostitution" exempts from conviction "those acting as prostitutes[.]" In light of the evidence adduced at trial, the circuit court found that "no reasonable juror could have found that [Ibarra] did not fall

7

within the statutory exception" because Ibarra herself was acting as a prostitute at all times that she was advancing CW's prostitution.

However, the circuit court found that a reasonable juror could find Ibarra guilty of promoting prostitution under the "profit" alternative pursuant to HRS § 712-1201(2). Specifically, the circuit court held that a reasonable juror "could have found that [Ibarra] and [CW] had an agreement or understanding that [CW] would pay [Ibarra] back for any airfare and/or half of the hotel room costs." The circuit court also found that a reasonable juror could have concluded that Ibarra knew the money paid to her by CW was from CW's prostitution activities, personally rendered by CW and not by Ibarra. Under this analysis, the circuit court concluded that the jury found Ibarra guilty of promoting prostitution under the "profit" alternative and denied Ibarra's motion for judgment of acquittal or in the alternative, motion for new trial.

### 5. Judgment of Conviction

On September 11, 2019, the circuit court entered its judgment of conviction. Ibarra was sentenced to a five-year term of probation and required to register as a sex offender pursuant to HRS § 846E-1.

**B.    ICA Proceedings**

On appeal, the ICA affirmed Ibarra's conviction in a Summary Disposition Order ("SDO") filed May 27, 2022.  The ICA found that substantial evidence supported the finding that Ibarra profited from prostitution because Ibarra testified that she and CW had an agreement that CW would pay money to Ibarra that CW earned by rendering services as a prostitute.  The ICA explained that "profits from prostitution" in HRS § 712-1201(2) is not defined in the financial accounting sense of profit, but rather, a defendant "profits from prostitution" if they "accept[] or receive[] money" other than for prostitution services the defendant personally renders.

**C.    Supreme Court Proceedings**

Ibarra filed a timely application for writ of certiorari, contending that she could not have profited from prostitution where CW simply paid Ibarra back for CW's airfare and CW's share of the hotel rooms.

## III. STANDARDS OF REVIEW

**A.    Sufficiency of the Evidence**

The test on appeal regarding sufficiency of the evidence is whether there is substantial evidence to support the conclusion of the trier of fact.  See State v. Mattiello, 90 Hawai'i 255, 259, 978 P.2d 693, 697 (1999) (internal citations omitted). "Substantial evidence" is "credible evidence which is

of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. (brackets and citations omitted). Additionally, "evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction." Id. (citations and internal quotation marks omitted).

B. **Statutory Interpretation**

"The interpretation of a statute is a question of law which this court reviews de novo." Labrador v. Liberty Mut. Group, 103 Hawaiʻi 206, 211, 81 P.3d 386, 391 (2003) (citations, internal quotation marks, and brackets omitted).

## IV. DISCUSSION

A. **To profit from prostitution within the meaning of HRS § 712-1201(2), a defendant must obtain value, or benefit from, another's prostitution activity**

Ibarra was convicted of promoting prostitution in violation of HRS § 712-1203(1), which provides that "[a] person commits the offense of promoting prostitution if the person knowingly advances <u>or</u> profits from prostitution." (emphasis added). HRS § 712-1201(1) defines what constitutes "advanc[ing] prostitution":

> [a] person "advances prostitution" if, <u>acting other than as a prostitute or a patron of a prostitute</u>, the person knowingly causes or aids a person to commit or engage in prostitution, procures or solicits patrons for prostitution, provides persons for prostitution purposes, permits premises to be regularly used for prostitution purposes, operates or assists in the operation of a house of prostitution or a prostitution enterprise, or

10

> > engages in any other conduct designed to institute, aid, or facilitate an act or enterprise of prostitution.

(emphasis added).  In the order denying Ibarra's motion for judgment of acquittal, or in the alternative, for a new trial, the circuit court's unchallenged finding of fact ("FOF") No. 12 states "that in all instances where [Ibarra] took action to advance prostitution[,] she herself was also acting as a prostitute" and thus, a reasonable jury could not find Ibarra guilty of promoting prostitution under the "advancement" alternative.

However, the circuit court concluded that a reasonable juror could find Ibarra guilty of promoting prostitution under the "profit" alternative.  A person "profits from prostitution" if "acting other than as a prostitute receiving compensation for personally-rendered prostitution services, the person accepts or receives money or other property pursuant to an agreement or understanding with any person whereby the person participates or is to participate in the proceeds of prostitution activity." HRS § 712-1201(2).  Despite the circuit court's finding that Ibarra was merely paid back for expenses that she fronted, the circuit court held that reimbursement constitutes "profit[ing]" within the meaning of the statute, because Ibarra knew that she was reimbursed from the proceeds of CW's prostitution activity.

The circuit court's interpretation of "profits from prostitution" is overbroad because it does not account for the

ordinary definition of the term "profit." The ordinary meaning of the term "profit" in HRS § 712-1201(2) is "a valuable return," "gain" or "the excess of returns over expenditure in a transaction or series of transactions[.]" Profit, Merriam-Webster, https://www.merriam-webster.com/dictionary/profit (last visited Dec. 8, 2022). Put another way, a person "accept[ing] or receiv[ing] money or other property" must be benefitting or obtaining something of value, in order to come within the scope of the statute. HRS § 712-1201(2). Otherwise, the term "profit" itself would be meaningless. Indeed, there is no ordinary definition of "profit" which includes mere reimbursement.

The legislative intent of HRS §§ 712-1203 and 712-1201 supports interpreting the language "accepts or receives money or other property" in light of the plain meaning of "profit." HRS § 712-1201(2). When interpreting a statute, "[a] court may examine [] sources [other than the language itself], including a statute's legislative history, in order to discern the underlying policy [that] the legislature sought to promulgate in the enactment of the statute." O'Grady v. State, 141 Hawai'i 26, 28, 404 P.3d 292, 294 (2017) (citations and quotations omitted). As Ibarra points out, in the 2011 amendments to the statute, the legislature stated that the purpose was to target "those who benefit most from [] prostitution[,]":

> Your Committee finds that prostitution remains a concern within Hawaii communities, not only for the prostitution activity itself, but also for the criminal conduct that it can bring to the area within which it occurs. However, there are also concerns that some of those engaged in prostitution are victims of human traffickers or others and are thus coerced into prostitution. Accordingly, it is incumbent on the State to craft legislation that combats those who **benefit most** from the prostitution, the traffickers and pimps, while providing protection to victims of traffickers who step forward seeking safety, and addresses the demand for prostitution by assuring that habitual patrons are penalized when they engage in this conduct. Your Committee believes that thoughtful legislation in those areas will act to protect those victimized by prostitution, including those coerced into prostitution and residents of sensitive communities that must grapple with the effects of prostitution and related criminal activities.

Stand. Comm. Rep. No. 1137, in 2011 Senate Journal, at 1284-85. (emphases added).  Thus, the apparent legislative intent was to target those who benefit from prostitution without engaging in prostitution themselves (e.g., pimps and sex traffickers).

Given the legislative intent to target those who "benefit most" from prostitution, a defendant who is merely reimbursed for expenses has not "profit[ed] from prostitution" within the intended meaning of HRS § 712-1201(2).  The ordinary definition of the term "benefit" is "to be useful or profitable to" or "to receive help or an advantage[.]"  Benefit (verb), Merriam-Webster, https://www.merriam-webster.com/dictionary/benefit (last visited Dec. 22, 2022).  The circuit court's unchallenged FOF No. 15 states that a reasonable juror could have found that there was an agreement or understanding only that CW would pay Ibarra "back for any airfare and/or half of the hotel room costs."  That is, Ibarra did not derive any

benefit from CW's prostitution activity; reimbursement is not "profitable" nor does it constitute an "advantage[.]" Id. Rather, reimbursement is the simple act of paying someone back, and "implies a return of money that has been spent for another's benefit." Reimburse, Merriam-Webster, https://www.merriam-webster.com/dictionary/reimburse (last visited Dec. 22, 2022). Given that Ibarra was merely reimbursed, and derived no profit or benefit (i.e., did not receive any value or an advantage) from CW's prostitution activities, the legislature did not intend Ibarra's conduct to come within the scope of HRS § 712-1201(2).[7]

The phrase "agreement or understanding" in HRS § 712-1201(2) must also be interpreted in light of the plain meaning

---

[7] The dissent cites to a comment to HRS § 712-1204 (1972), which is "functionally identical to the present HRS § 712-1203[,]" to argue that Ibarra's actions were like those of a taxicab driver, bartender, or hotel clerk who engage in "small scale acts of trafficking that the provision was intended to target." But the record is clear that unlike those small scale promoters, CW, not Ibarra, made the arrangements for CW's dates. The comment provides:

> This section strikes at the small scale promoter. The taxicab driver who pimps for a prostitute, the bartender who sets up customers for a prostitute, and the hotel clerk who regularly furnishes the prostitute and his or her customer with accommodations would all come within the ambit of this provision.

Ibarra's conduct in the instant case is distinct from the listed examples. Ibarra did not "pimp" for CW, as did the taxicab driver. Ibarra did not set CW up with customers as did the bartender; CW answered her own phone and set her own dates. And Ibarra did not arrange accommodations for CW to engage in prostitution like the hotel clerk; CW made the arrangements for her own prostitution dates. CW answered "[y]es" when asked if it would "be fair to say…that when [she] would get either a call or text on [her] phone, that [she] would make the date arrangement [her]self."

14

of the term "profit" and the legislature's intent to target those who benefit most from prostitution without engaging in prostitution themselves.  Ibarra and CW had an "understanding" that CW would reimburse Ibarra for the airfare and hotel rooms, and Ibarra knew that she was reimbursed from the proceeds of CW's prostitution activities.[8],[9]  However, there was no

---

[8]    The circuit court's unchallenged FOF's No. 15 and 16 state:

15. In this case, based on the evidence adduced at trial, a reasonable juror could have found that the Defendant and complaining witness had an agreement or understanding that the complaining witness would pay the Defendant back for any airfare and/or half of the hotel room costs.

16. In this case, based on the evidence adduced at trial, a reasonable juror could have further found that Defendant knew that the money paid to the Defendant by the complaining witness arose from the complaining witness's prostitution activities.

Thus, the circuit court did not find that Ibarra and CW had an "agreement or understanding" that CW was to specifically reimburse Ibarra with the proceeds of CW's prostitution activity.  Rather, the circuit court found that CW and Ibarra had a general agreement or understanding that CW would pay Ibarra back for the airfare and half of the hotel room costs, and that Ibarra knew, after the fact, that the money CW used to reimburse Ibarra was from the proceeds of CW's prostitution activity.

[9]    The dissent states "that there was a pre-existing agreement that CW would repay [Ibarra] from the proceeds of [CW's] dates" and it was "within the province of the jury to credit Ibarra's testimony and find there was such an understanding."  However, as noted above (supra n. 8), the circuit court's FOF's No. 15 and 16 state only that (i) there was an agreement that CW was to reimburse Ibarra for fronting the costs of the trip to Hawai'i and (ii) that Ibarra knew, after the fact, that she was reimbursed from the proceeds of CW's prostitution activity.  These findings were not challenged on appeal, and thus "are binding on the appellate court."  Okada Trucking Co. v. Bd. of Water Supply, 97 Hawai'i 450, 458, 40 P.3d 73, 81 (2002); see also Kawamata Farms v. United Agri Prods., 86 Hawai'i 214, 252, 948 P.2d 1055, 1093 (1997) (defendants "have waived any challenge regarding the findings of fact that support the circuit court's denial of their motion for a new trial[.]").  Assuming arguendo that this court could disregard FOF's No. 15 and 16, an agreement requires "[a] mutual understanding between two or more persons about their relative rights and duties[.]"  Agreement, Black's Law Dictionary (11th ed. 2019).  CW explicitly testified that there was no agreement that she would repay Ibarra.  Accordingly, there was no mutual understanding

continued...

"agreement or understanding" that Ibarra was to benefit (i.e., gain value or an advantage) from CW's prostitution activity. Interpreting the language "agreement or understanding" in light of the associated term "profits" requires that there must be an "agreement or understanding" that the defendant will indeed benefit or gain value from another's prostitution activity.  See Advertiser Publishing Co. v. Fase, 43 Haw. 154, 161, (1959) ("There is a rule of construction embodying the words *noscitur a sociis* which may be freely translated as 'words of a feather flock together,' that is, the meaning of a word is to be judged by the company it keeps.").  The State did not prove that Ibarra and CW had an agreement or understanding whereby Ibarra was to gain value or benefit from CW's prostitution activity.

The interpretation of "profits from prostitution" relied upon by the circuit court and the ICA would broaden the scope of the statute beyond the meaning intended by the legislature.[10]  The legislature explicitly intended to craft

---

. . . continued

between Ibarra and CW that CW was going to reimburse Ibarra from "the proceeds of [CW's] prostitution activity[,]" as required by HRS § 712-1201(2).  Thus, even under the dissent's interpretation, where HRS §§ 712-1201(2) and 712-1203 penalize "any agreement or understanding to receive the proceeds of another person's prostitution activities[,]" Ibarra's conduct does not fall within the scope of the statute.

[10]    Ibarra notes that if her conduct falls within the scope of HRS § 712-1201(2), then if CW paid Ibarra back for a pack of gum, it would constitute "profiting from prostitution" as well.  The dissent dismisses this argument, contending that it "ignores the language specifying that the

continued...

legislation targeting only "those who benefit most from the prostitution" and not prostitutes themselves.  Stand. Comm. Rep. No. 1137, in 2011 Senate Journal, at 1284-85.  (emphasis added). Accordingly, the State failed to prove that Ibarra "profit[ed] from prostitution," within the meaning of HRS § 712-1201(2).[11,12]

---

. . . continued

receipt of money must be "pursuant to an agreement or understanding.""  The fact that "there must be a preexisting agreement or understanding wherein both parties agree that one party will engage in prostitution and that some or all of the proceeds will go to the other party" does not refute the point. As an example, person X and person Y are long-time friends that both engage in prostitution.  X does not have money for lunch, so Y agrees to pay for X's meal, pursuant to an understanding that X will reimburse Y from the proceeds of the prostitution date that X independently scheduled for later that day. Under the dissent's interpretation of HRS § 712-1201(2), Y would be guilty of promoting prostitution.

[11]    The dissent asserts that interpreting HRS § 712-1201(2) to require the defendant obtain value from another's prostitution activity risks creating a safe harbor for traffickers.  Specifically, the dissent states that sex traffickers may provide funds or assistance, which the victim agrees to repay, but if "the loan proves prohibitively difficult to repay, [] the victim is trapped in a coercive dynamic."  However, because the criminal conduct the dissent is concerned would receive safe harbor protection is criminalized elsewhere in Hawai'i law, there is no such safe harbor created for traffickers who provide coercive loans to victims.  HRS § 712-1203, for example, provides that a person is guilty of "promoting prostitution" if they "advance[] prostitution" or "profit[] from prostitution."  Under the advancement alternative, a person is guilty if the person "knowingly causes or aids a person to commit or engage in prostitution, procures or solicits patrons for prostitution, provides persons for prostitution purposes, permits premises to be regularly used for prostitution purposes, operates or assists in the operation of a house of prostitution, or a prostitution enterprise, or engages in any conduct designed to institute, aid or facilitate an act or enterprise of prostitution."  HRS § 712-1202(1) also provides that a person is guilty of sex trafficking if they knowingly advance prostitution "by compelling or inducing a person by force, threat, fraud, coercion, or intimidation to engage in prostitution[.]"  Thus, the dissent's concern about creating a safe harbor is  not a reason to contradict legislative intent and criminalize reimbursement between friends from funds gained from prostitution.
     Moreover, the dissent's interpretation, which would seemingly result in finding that a person is guilty of profiting from prostitution where they are knowingly reimbursed from the proceeds of another's prostitution activity, risks criminalizing the conduct of those like Ibarra, in cases where "the

continued...

## V.    CONCLUSION

For the foregoing reasons, the ICA's June 20, 2022 judgment on appeal, the circuit court's September 11, 2019 judgment of conviction, and the circuit court's October 21, 2019 order denying Ibarra's motion for judgment of acquittal, are reversed.

| | |
|---|---|
| Myron H. Takemoto<br>for Petitioner | /s/ Sabrina S. McKenna |
| | /s/ Michael D. Wilson |
| Brian R. Vincent<br>for Respondent | /s/ Todd W. Eddins |



---

. . . continued

equities" do not favor conviction, as the circuit court explicitly acknowledged.  Convicting Ibarra of promoting prostitution because she received funds for reimbursement of a personal debt from a friend who earned the money as a prostitute, and requiring her to register as a sex offender serves no public safety purpose, but limits her professional opportunities and makes it more likely that she will continue to engage in prostitution. Adopting the dissent's interpretation could lead to the criminalization of landlords, personal friends, retail establishments, grocery stores and day care centers who receive money from people – including single parents — if they believe the money was earned through prostitution.  The legislature did not intend to so cripple the welfare of those seeking to survive through prostitution.

[12]    Ibarra also contends that the circuit court erred in failing to ensure that Ibarra's waiver of her right not to testify was knowing, intelligent and voluntary.  The ICA was correct to conclude that the circuit court was not required to engage Ibarra in a Tachibana colloquy prior to her testimony. State v. Lewis, 94 Hawai'i 292, 296, 12 P.3d 1233, 1237 (2000) held that an ultimate Tachibana colloquy is not required in cases where the defendant testifies.  Although State v. Torres, 144 Hawai'i 282, 285, 439 P.3d 234, 237 (2019) held that a Tachibana colloquy must be given in all trials, including where a defendant testifies, this requirement was imposed prospectively only.  Because Torres was decided after Ibarra's trial, Lewis is controlling, and the circuit court was not required to engage Ibarra in a Tachibana colloquy.