103 P.3d 412

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Dieter THATE, Defendant–Appellant.**

No. 25918.

Intermediate Court of Appeals of Hawai'i.

Dec. 10, 2004.

---

Gary L. Hartman, on the briefs, for Defendant–Appellant.

Mangmang Qiu Brown, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by BURNS, C.J.

Defendant–Appellant Dieter Thate (Father) appeals from the Judgment of Conviction and Sentence, filed on June 20, 2003 in the Family Court of the First Circuit, the Honorable William J. Nagle, III presiding. The judgment convicted Father of one count of Harassment [1] as prohibited by Hawaii Revised Statutes (HRS) § 711–1106(1)(a) (Supp. 2003).[2]

Father asserts the following points of error:

A. The Trial Court committed reversible error where the Court's written Findings of Fact and Conclusions of Law are not supported by the trial testimony.

B. The Trial Court committed reversible error where the Court's oral Conclusions of Law misstates the law of parental justification defense, in finding [Father] guilty for failure to exercise other alternative measures of discipline for the child's misconduct.

C. The Trial Court committed reversible error in rejecting [Father's] parental justification defense where the State failed to offer any evidence to overcome the defense.

---

1. Defendant–Appellant Dieter Thate was also charged with another count of Harassment for conduct toward his wife but, after trial, was acquitted of this charge.

2. Hawaii Revised Statutes (HRS) § 711–1106(1)(a) (Supp.2003) states as follows:

**Harassment.** (1) A person commits the offense of harassment if, with intent to harass, annoy, or alarm any other person, that person:
(a) Strikes, shoves, kicks, or otherwise touches another person in an offensive manner or subjects the other person to offensive physical contact[.]

Based on our conclusion that the State failed to submit sufficient evidence to satisfy its burden (1) of disproving beyond a reasonable doubt the justification evidence that was adduced or (2) of proving beyond a reasonable doubt facts negativing the justification defense, we reverse.

## BACKGROUND

On April 14, 2003, Father and Patricia Lynn Thate (Mother) had been married for about seventeen years. They had a fourteen-year-old daughter (Daughter 14) and a ten-year-old daughter (Daughter 10). Police Officer Brad Heatherly (Officer Heatherly) received a dispatch call at around 4 o'clock in the afternoon regarding an "argument" at a residence. When Officer Heatherly arrived at the house in Kailua, he was met by Daughter 14, who was crying in a slightly hysterical manner. In Officer Heatherly's words, "the basic story from what I remember, it was something in regards to [Daughter 14] was telling [Father] to leave, they had some sort of argument. And when [Daughter 14] approached [Father], as she was telling him to leave, he backhanded her." Officer Heatherly described Daughter 14's overall demeanor as "crying and upset that her father would hit her." He noted that Daughter 14 appeared to be "surprised" that her father hit her. Officer Heatherly testified that Daughter 14 had "some redness to her facial area" but that it was "nothing ... that I would have need to call for an ambulance for her." He did not see any blood and Daughter 14 did not complain of any bleeding. Daughter 14 and Mother did not request any type of medical attention. As a result, Officer Heatherly did not take any pictures because he did not "see any need to take pictures[.]"

Daughter 14 testified that, on April 14, 2003, she was home at approximately 4 o'clock in the afternoon, talking to Mother in the master bedroom with Daughter 10. Daughter 14 stated that the following events occurred:

Q Okay. The first time he came home, what happened?

A He came in and he talked to my mom about the electricity bill and he tried to take my sister with him to the bank. And

I told him not to and then he got upset and left. And he came back about 15 minutes later and walked through the side door.

. . . .

Q Okay. When he went through that side door, where were you at that time?

A We were back in another room.

Q Still in the bedroom?

A Yes.

Q Okay. While you guys were in the bedroom, did you hear your father go through the side door?

A Yeah. I walked out into the living room.

Q Okay. And upon seeing your father, what did you do?

A I ran back into the bedroom to my mom.

Q Okay. And what happened?

A And he came back in and I was backhanded in the face.

Q Okay. When you were backhanded in the face, did you—was your dad yelling?

A No.

Q Was your mom yelling?

A No.

Q Were you yelling?

A I had a tone.

Q Okay. When you say tone, what do you mean?

A I was asking him to leave.

. . . .

Q Okay. And when he backhand [sic] you, how close was he to you?

A A foot and a half, two feet.

Q Do you remember what hand he used?

A I would have to say his right hand.

Q Okay. And he hit you on your right side, you said?

A Yeah.

Q Okay. When he hit you, did you feel any—anything?

A Yeah. And I had a cut in my mouth from my braces for about a week.

Q Okay. Did that cut cause you my [sic] pain?

A For a while.

. . . .

Q [Daughter 14], after your dad ... backhanded you in your mouth, what happened then?

A Then my mom was upset, so she went behind him and I think she pushed him.

[COUNSEL FOR FATHER]: Can you ... say that again please?

[DAUGHTER 14]: My mom went behind him and then he walked out of the bedroom into the kitchen . . . .

. . . .

Q Okay. When your father goes out into you said the kitchen—

A She was following him and yelling at him, I think.

Q —were you also following your mother?

A Yes.

On cross-examination, Daughter 14 admitted the following events also occurred:

Q How many times did you tell him [to leave]?

A I don't know. A lot.

Q A lot?

A Yeah.

Q Five? Ten? Were you yelling?

A Yes.

. . . .

Q Did you say anything else?

A No.

Q Did you call him a sicko?

A No.

Q Did you call him a psycho?

A A psycho?

Q Yeah.

A Yes, I did.

. . . .

Q Okay. But you yelled at him—

A Yes, I did.

Q —at least ten times—

A Yes.

Q —to get out?

Did you swear?

A No.

. . . .

Q Did he make any gesture that he was going to hit you again?

A No.

Q No? He walked—he walked away after he slapped you?

A Yes.

Q And was it his open hand?

A Yes. It was—it was the back.

Q It was not a punch?

A No.

Q It was not a fist?

A No.

Q It was open hand?

A. Yeah, it was open hand.

THE COURT: I'm sorry. Did he hit you with the open part of his hand or with the back of his hand?

THE WITNESS: The back. The back.

THE COURT: So he hit you with the knuckle part of his hand?

THE WITNESS: Uh-huh. Yes.

On redirect examination, when Daughter 14 was asked why did she want Father to leave, she responded in relevant part as follows:

Q ... Can you tell me why you wanted your father to leave?

A Well, one time he attempted suicide, and I was very angry about that.

Q When he came home that day, did you and your mom want him to leave the house?

A Yes.

Q Okay. Was it a safety issue?

A Yes.

Q Okay. Where was your father supposed to be at?

A He was supposed to be at the hospital.

. . . .

Q When you and your mom are telling him to leave, where do you want him to go?

A I think we wanted him back at the hospital as long as he needed to be.

Father testified he had attempted suicide on April 10, 2003. Initially, he was at the emergency room in Wahiawa. Then he was

transferred to Kaiser Hospital in Moanalua where he spent two nights before being transferred to Kekela at Queen's Hospital. On April 14, 2003, he was "officially released [from the hospital] and with no further recommendation so that I have to see a psychologist or anything." Father further testified, in relevant part, as follows:

A ... And I was about to be released and the doctor called [Mother] to pick me up or at least to do some counseling together, and [Mother] refused. So I had no money. I had to borrow some money from a friend, who worked as a nurse at the Queen's Hospital, and order some clothes because they got lost on my transfer, and I went home by cab.

So I came to the house, and the main door was open. Only the screen was there. And when I came towards the door, a girlfriend of [Daughter 14] ... was there; saw me and chased to the back room, which is our master bedroom, to probably alert [Daughter 14] or [Mother]. And then [Daughter 14] came out, and I do not really recall what she said. I think she started already there saying there that I'm a sicko and I'm a psycho and what I'm doing there and she want me rather be dead and things. It was a little hectic. But I didn't do—

. . . .

A She called me a sicko and a psycho and she told me she want me rather be dead. So—

Q How did you respond to that?

A I didn't say anything. I just walked further because I wanted to see [Mother]. But [Mother] came out of the master bedroom and alongside the hallway. And so I realized the electricity was off. And I said, What happened? And she said, yeah, I didn't do anything. I asked her if you went to the bank or the post office. And she said, [e]ver since I left, which was on the 10th, she never left the house and also the kids didn't go to school. And I said, Okay, then, let me go to the bank and pick up some money so I pay HECO [Hawaiian Electric Company], because there was no electricity. So I left. And—

Q What time was this?

A I don't recall. I thought it was 3 something, 3, 4 o'clock, in that area. I'm not really sure. And [Daughter 10] wanted to come with me. And then [Daughter 14] said no. And then [Mother] said no. And I remember saying something to [Daughter 14] that she has no right to tell ... my daughter to come with me or not. But I left anyway.

So I went to the bank, to the post office, picked up some money, enough money to— to pay HECO and came back, because I was gone from the 10th and this was the 14th. I spent time in the hospital. I needed to talk to my clients to make sure they understand everything is fine, so to speak. And also I would like to pick up HECO's invoice.

. . . .

A ... I left the first time to go to the bank and pick up money and check the P.O. Box if there was more money, checks coming in. And then I came back at probably 15 minutes later and the front door was locked this time. . . . So I went in through the carport.

And I'm not sure where—where [Daughter 14] saw me, but I think when I walked in, she came towards me and then she said things like, Get out of the house, several times and, You're a psycho, you're a sicko, and you should rather be dead. She repeated this. And I walked to the master bedroom area where also is our office located to try to pick up HECO invoice and to pick up my little business phone book so I can call my clients on my way.

So then when I came out of the office in that hallway, [Daughter 14] confronted me. And [Daughter 14] kind of pushed me and yelled at me and said, [y]ou sicko, you psycho, and get out, get out. And then—

Q Were you in the hallway or were you in the office area?

A I came out of the hall, out of the office, and then it kind of slanted—it goes to the master bedroom. And [Daughter 14] was right there, where I wanted to go to . . . . And she was standing there in my way.

Q And she—

A And didn't move away.

Q She pushed you was your testimony?

A Yeah, she pushed me like this. I mean, she was angry and I understood. I mean, I went out on a very bad note, and I'm—I'm really sorry for that. But on the other hand, I told her, You cannot talk to me that way. And I really said it and then I hit her.

Q How many times did you—did she yell at you?

A I don't know. It was quite a bit and she was yelling really hard ... I thought she was totally out of control, she cannot talk to me like that. I have never hit her before in my life. So I hit her . . . .

Q Was it an open-hand slap?

A Oh, yes. Oh, yes. And it wasn't really hard.

Q With your right hand?

A Yes, with my right hand.

. . . .

Q When ... you slapped her, what were—

A I was really up—first of all, I was really angry. I couldn't believe that she was talking to me like this. And I told her this. And then I slapped her and I walked away.

Q How many times did you tell her that you didn't want to be talked to that way?

A Oh, just once. Just once.

Q Just once?

A Just once, very, very clear.

Q And what did she say to, Don't talk to me that way?

A I think she started yelling. She started screaming after I hit her because I think she was totally surprised that I did. I never did something like this before. I mean, the whole situation was new, kind of . . . .

Q ... [W]hat was your purpose in slapping [Daughter 14]?

A Discipline her. I mean, she cannot talk to me like this regardless. I mean, she cannot tell me to leave. I just come from the hospital.

Q And you're her natural father?

A Oh, yes.

Q And you had been living with her and [Mother] for all her life?

A Yes.

Q And you as the father wanted to discipline her?

A Of course.

Q Why do you believe that discipline is appropriate for that?

A Well, I think it's—it's totally out of—inappropriate to tell her father that he's a psycho, that he's a sicko, and that he has to leave and she want rather have him been dead and standing in front of him and pushing him back and—I think that's absolutely inappropriate for a 14–year–old child to tell any part of his parents. I mean—

Q After you slapped her, what happened next?

A I just walked away and she started screaming and [Mother] came storming . . . .

. . . .

Q As to [Daughter 14], as her father, do you feel justified in disciplining her?

A Absolutely. Absolutely.

Mother testified that "my husband came home and said he was home from the hospital and, you know, and this and that. And we said, Why are you home? You're supposed to be in the hospital." After Father went to the bank, he came back to the house the second time and "said that he wanted his [cellular] phone and phone book." In Mother's words, "That's all he wanted, and then he wanted to leave." Mother and Daughter 14 were "telling him to leave, to get out of the house[.]" Mother admitted that Daughter 14 must have yelled "get out" at least "[t]wo or three times." She stated that Father told [Daughter 14] that "[y]ou better watch out or I'm going to hit you really hard[,]" and "backhanded her." Mother testified that Father had never hit Daughter 14 before, but that "he's threatened to many times." Mother affirmed that Daughter 14 called Father a "psycho". According to Mother, Father "backhanded [Daughter 14] really hard." After seeing Father hit

Daughter 14, Mother "was very angry with him."

At the conclusion of the trial, the court orally decided, in relevant part, as follows:

[T]he Court is going to find that the prosecution has proved each and every element of the offense in Count I beyond a reasonable doubt. There is—as [defense counsel] stated in his final argument, there is no dispute about the fact that your daughter was struck, that you struck her, that you intended to strike her at that time. The question is whether that—that slap is justified by the defense of parental justification. And the Court is going to find that the ... actions that you took in slapping her, particularly in the face, were not proportionate to the misconduct being punished and were not reasonable under the circumstances.

I understand from the testimony that this was a very emotional scene that you came back to the second time from the bank. But under the circumstances, it seems to the Court that there were a number of alternatives to you as far as discipline was concerned. And your actions in physically striking your daughter were not reasonable or proportionate to the circumstances. Therefore, the Court is going to find you guilty as to Count I.

On September 15, 2003, the court filed the Findings of Fact and Conclusions of Law (FsOF and CsOL). With the challenged FsOF and CsOL printed in bold, they state, in relevant part, as follows:

1. The charges against [Father] arose out of an incident which occurred on April 14, 2003 at the family residence .... On that occasion, [Father] is alleged to have committed two counts of the offense of Harassment against [Daughter 14], and his wife, [Mother]. [Father] is alleged: "with intent to harass, annoy or alarm another person, struck, shoved, kicked or otherwise touched ( [Daughter 14] and [Mother] ) in an offensive manner or subjected the other person to offensive physical contact."

2. The background to the events giving rise to these charges bears recitation. **It is undisputed that [Mother] and [Father] were at least hostile to one another in the days prior to April 14, 2003;** both admitted that their marriage had been in dire straits for some months prior to the incident. [Mother] and [Father] have two daughters: [Daughter 14], age 14 at that time, and [Daughter 10], aged 10 at the time of the incident. [Father] attempted to take his own life in the week prior to April 14, 2003, and had been released from Queens Medical Center Kekela Ward immediately prior to the incident at the family home. Upon being released from Queens, [Father] telephoned [Mother] and requested that she drive to Queens from Kailua and pick him up; [Mother] refused. [Father] took a cab from Queens to the family house and upon entering, found that the electricity had been turned off by Hawaiian Electric Company for nonpayment of the utility bill. [Father] drove to the bank, withdrew funds and made the required payment, returning to the residence.

3. Upon his return to the residence, [Father] was confronted by his daughter, [Daughter 14], who demanded that her father leave the residence at once, and leave [Daughter 14], her mother and [Daughter 10] alone. [Father] ignored [Daughter 14] while he searched for his cellular phone in his "office". **[Daughter 14] testified that she was upset that her father had attempted to take his own life,** had left the hospital and **apparently returned home as though nothing had occurred. As one might expect, she was in a very emotional state,** calling [Father] a "sicko" and demanding that he leave the house.

4. It is undisputed by [Father] that he persisted in trying to locate his cell phone in spite of [Daughter 14]; that he ignored her behavior while he searched in his office and after locating his cell phone, did not leave the residence. Instead, [Father] moved towards the kitchen area to find his address book, ostensibly to contact his business clients and reassure them. At that point, [Daughter 14] attempted to block his way and [Father] intentionally slapped her on the right side of her face. [Father] at that time was over six feet tall

and over 200 pounds; **[Daughter 14] was a foot smaller and approximately 100 pounds.**

5. While [Daughter 14] testified that [Father] "backhanded" her, striking the right side of her face and mouth with his knuckles, [Father] admitted slapping his daughter with an open palm on the side of her face. The slap caused pain to [Daughter 14], and **further caused bleeding to the inside of her mouth because of her dental braces.** The spot where [Father's] hand struck [Daughter 14's] face was sufficiently visible and red as to be observed by HPD Officer Brad Heatherly, when he interviewed [Daughter 14] some 15 minutes after the slap. **Moreover, the slap frightened [Daughter 14], and caused her to move away from her father.**

6. The Court finds that [Father's] testimony on his motivation for slapping [Daughter 14] is not credible. **It is undisputed that [Father] initiated the confrontation with his daughter by entering the residence,** searching his home office and then proceeding further into the residence. At no time did [Father] attempt to defuse the volatile situation or try to reason with his daughter to calm her. Instead, [Father] chose to ignore her and **escalate the confrontation; his actions are contrary to any legitimate expression of concern for parental discipline.** The Court finds that [Father] simply lost his temper and struck his daughter as a consequence.

. . . .

From the foregoing findings of fact, the Court concludes the following as a matter of law.

A. As to Count I, in which [Father] is charged with Harassment of [Daughter 14], in violation of § 711–1106(a), HRS, the Court concludes that the State has proved each and every element of the offense. And because the testimony of the witnesses remains largely undisputed, the Court finds that such proof is beyond a reasonable doubt. Briefly, [Daughter 14] testified, and [Father] admitted, that he intended to strike her; that he slapped her face with force sufficient to cause her pain;

that the slap was an offensive physical contact.

. . . .

C. [Father's] defense to Count I lies in the exercise of parental discipline. § 703–309, HRS, justifies the use of force by a parent under the following circumstances:

"The use of force upon or toward the person of another is justifiable under the following circumstances:

. . . .

(a) **The force is employed with due regard for the age and size of the minor and is reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct; and**

(b) The force used is not designed to cause or known to cause a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage." (Emphasis added)

It is undisputed that [Father] is the father of [Daughter 14], and thus, among the class of persons to whom § 703–309, HRS may be available as a defense. [Father's] testimony is sufficient to raise the defense of parental discipline as a justification for the slap; namely, that he believed that the force was employed "with due regard to the age and size of the minor" and that the force was "reasonably proportionate" to the misconduct being punished. See *State v. Stocker*, 90 Hawai'i 85, 95, 976 P.2d 399, 409(1999) . . . .

D. The State has carried its burden of proving beyond a reasonable doubt that [Father's] actions exceeded the defense of justification for parental discipline. First, unlike *Stocker*, supra, the slap by [Father] cannot be considered "mild"[,] 90 Hawaii at 96, 976 P.2d at 410[,] or "reasonably proportionate to the misconduct being punished[."] [Father's] blow was delivered with sufficient force to cause bleeding inside [Daughter 14's] mouth, where her metal braces scraped her mouth. Officer Heatherly observed the effects of the slap some 15 minutes subsequent to the incident, when he investigated the complaint.

Second, [Father] cannot "have it both ways[."] He cannot initiate and escalate an emotional situation with his family, make no attempt to defuse or calm the situation, and then rely on the justification of parental discipline to excuse the loss of his temper. Simply put, [Father's] actions cannot be seen as "reasonably ... necessary to protect the welfare of the recipient.". [sic] Based upon the Court's finding that [Father] simply lost his temper and struck his daughter, the Court concludes as a matter of law that the prosecution has carried its burden of proof in overcoming [Father's] asserted parental discipline defense. The Court therefore finds that [Father] committed the offense of Harassment in violation of § 711-1106, HRS.

Father filed a notice of appeal on June 25, 2003. The appeal was assigned to this court on May 19, 2004.

## STANDARD OF REVIEW

### Findings of Fact/Conclusions of Law

A trial court's findings of fact are reviewed under the "clearly erroneous" standard of review. *Dan v. State*, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994).

A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. The circuit court's conclusions of law are reviewed under the right/wrong standard.

*State v. Locquiao*, 100 Hawai'i 195, 203, 58 P.3d 1242, 1250 (2002) (internal quotation marks and citations omitted) (quoting *State v. Harada*, 98 Hawai'i 18, 22, 41 P.3d 174, 178 (2002)). "A conclusion of law that is supported by the trial court's findings of fact and that reflects an application of the correct rule of law will not be overturned." *Dan*, 76 Hawai'i at 428, 879 P.2d at 533 (internal quotation marks and citation omitted).

Substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *State v.*

*Richie*, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (internal quotation marks and citation omitted).

## DISCUSSION

### A.

In his first point of error, Father contests specific findings of fact and argues that they were "not supported by the testimony or evidence adduced at trial[.]"

Father challenges paragraph 2, second sentence, which states, "It is undisputed that [Mother] and [Father] were at least hostile to one another in the days prior to April 14, 2003." Father argues that the "trial transcript is void of any references to [Mother] and [Father] being hostile to each other in the days prior to April 14, 2003." Based on our review of the record, we agree with Father. The State responds that "the trial court could reasonably have inferred from [Mother's] and [Daughter's] testimony that a great deal of tension and stress existed among the family members involved in this case." Although we agree with the State, we note that there is a material difference between "tension and stress" and "being hostile."

Father challenges paragraph 3, third sentence, which states, "[Daughter 14] testified that she was upset that her father had attempted to take his own life, had left the hospital and apparently returned home as though nothing happened." We agree that the challenged part of this finding is not supported by evidence and is thus clearly erroneous.

Father challenges paragraph 3, fourth sentence, which states, "As one might expect, [Daughter 14] was in a very emotional state, calling [Father] a 'sicko' and demanding that he leave the house." Father argues that there is no "testimony whatsoever in the transcript to support the Court's analysis that [Daughter 14's] response to [Father] coming home from the hospital ... in calling him 'a sicko' is 'as one would expect.'" We agree with Father. However, the trial court's use of the phrase "[a]s one might expect" was limited to the fact that "[Daugh-

ter 14] was in a very emotional state" and not to her "calling [Father] a 'sicko' and demanding that he leave the house."

Father challenges paragraph 4, fourth sentence, which states, "[Father] at that time was over six feet tall and over 200[ ] pounds; [Daughter 14] was a foot smaller and approximately 100 pounds." Father contends that "[t]here is no testimony in the record as to [Daughter 14's] height and weight." He may be right that there is "no testimony" but he is wrong that the challenged part of this finding is clearly erroneous. Exhibit 1 in evidence is a police report stating that Daughter 14 is 5 feet tall and weighs a hundred pounds.

Father challenges paragraph 5, second sentence, which states, "The slap caused pain to [Daughter 14], and further caused bleeding to the inside of her mouth because of her dental braces." He argues that there is "no testimony or other evidence adduced at trial that the slap caused any bleeding." We agree. Daughter 14 testified that she "had a cut in [her] mouth from [her] braces for about a week" and that cut caused her pain "[f]or a while." There is no evidence of "bleeding".

Father challenges paragraph 5, fourth sentence, which states, "Moreover, the slap frightened [Daughter 14], and caused her to move away from her father." Father contends that there is no evidence that the slap frightened Daughter 14. We agree. Although there is evidence that Daughter 14 was afraid of Father, that the slap "upset" and "surprised" Daughter 14, that the slap "upset" Mother, that Mother then went behind Father and pushed him, and that Father then walked out of the bedroom into the kitchen, there is no evidence that the slap frightened Daughter 14 or that it caused Daughter 14 to move away from Father.

■ Father challenges the following two findings in Finding of Fact No. 6:

*It is undisputed that [Father] initiated the confrontation with his daughter by entering the residence, searching his home office and then proceeding further into the residence . . . . Instead, [Father] chose to ignore her and escalate the confrontation;*

*his actions are contrary to any legitimate expression of concern for parental discipline.*

(Emphasis added.) Father argues that the "State offered no argument or evidence that [Father] was the initiator, nor that [Father's] actions were anything other than a parent administrating discipline to [a] child for misconduct." We agree. Father was entering his own house after being discharged from the hospital and had to find his own ride home because Mother refused to pick him up. He was confronted by a daughter who displayed no filial piety or respect, used insulting words to describe him, and ordered him out of his own house. The fact that Father entered and remained in his own house and ignored Daughter 14's rantings and ravings while he looked for his cellular phone, phone book, and HECO invoice does not support a finding that Father acted unreasonably and without any legitimate expression of concern for parental discipline.

**B.**

HRS § 703–309 (1993) states, in relevant part:

**Use of force by persons with special responsibility for care, discipline, or safety of others.** The use of force upon or toward the person of another is justifiable under the following circumstances:

(1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor, or a person acting at the request of the parent, guardian, or other responsible person, and:

(a) The force is employed with due regard for the age and size of the minor and is reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct; and

(b) The force used is not designed to cause or known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage.

HRS § 707–700 (1993) defines "Substantial bodily injury" as

bodily injury which causes:

(1) A major avulsion, laceration, or penetration of the skin;

(2) A chemical, electrical, friction, or scalding burn of second degree severity;

(3) A bone fracture;

(4) A serious concussion; or

(5) A tearing, rupture, or corrosive damage to the esophagus, viscera, or other internal organs.

Father's second point of error is that the trial court misstated the law when, in its oral decision at the end of the trial, it stated that there were "a number of alternatives [available] to [Father] as far as discipline was concerned" and concluded that "[Father's] actions in physically striking [his] daughter were not reasonable or proportionate to the circumstances." Father's third point of error is that "[t]he Trial Court committed reversible error in rejecting [Father's] parental justification defense where the State failed to offer any evidence to overcome the defense."

In *State v. Crouser*, 81 Hawai'i 5, 911 P.2d 725 (1996), the Hawai'i Supreme Court stated, in relevant part, as follows:

HRS § 703–309(1) (1985) was adopted verbatim from section 3.08(1) of the Model Penal Code, the commentary to which was extensively quoted in *[State v.] Kaimimoku* [, 9 Haw.App. 345, 841 P.2d 1076 (1992) ]:

The formulation is in some respects less stringent than that in Section 147 of the Restatement of Torts, which speaks of "such reasonable force" and "such reasonable confinement" as the parent "reasonably believes to be necessary for" the "proper control, training, or education" of the child. . . .

The formulation also differs from the Restatement in not explicitly demanding that the force be reasonable. It was believed that so long as a parent uses moderate force for permissible purposes, the criminal law should not provide for review of the reasonableness of the parent's judgment.

9 Haw.App. at 351, 841 P.2d at 1079. The 1992 amendments significantly altered this formulation. It is no longer enough that the use of force be for the purpose of discipline; it must be reasonably related to that purpose. The present version of HRS § 703–309(1), unlike the statute at issue in *Kaimimoku*, provides for objective review of the parent's judgment, bringing the statute much closer to the formulation found in the *Restatement (Second) of Torts* § 147 and that used by a substantial majority of other jurisdictions. *See* Annotation, *Criminal Liability for Excessive or Improper Punishment Inflicted on Child by Parent, Teacher, or One in Loco Parentis*, 89 A.L.R.2d 396, 1963 WL 13713 (1963 & Supp.1995).

Although we have found no other statute employing the identical language, it seems clear that to be "reasonably related" to the purpose of punishing misconduct, use of force must be both reasonably proportional to the misconduct being punished and reasonably believed necessary to protect the welfare of the recipient. Subsection (b) of HRS § 703–309(1) defines the maximum degree of force that is justifiable under the statute. Subsection (a), as amended, makes clear that physical discipline may be so excessive that it is no longer reasonably related to safeguarding the welfare of the minor, even if it does not exceed the bounds set in subsection (b).

In this case, the family court noted that it "must judge the action based upon the reasonable hand standard or reasonable person standard." Considering (1) Minor's age and her size relative to Crouser's, (2) the testimony that the force was excessive and caused her to be unable to sit in her classes, (3) the nature of the injuries as depicted by the photos, (4) the medical testimony, and, in particular, (5) Pond's testimony that she was able to help Minor improve her grades significantly and stop lying without resort to physical force, the court concluded that the physical discipline Minor endured was not reasonably related to the purpose of protecting her welfare. There is nothing in the record that leads us to a "definite and firm conviction that a mistake has been made." Therefore, we

hold that the trial court's conclusion that the force used was not reasonably related to protecting Minor's welfare was not clearly erroneous. Consequently, Crouser's contention that "[t]here was insufficient evidence to support the verdict in the instant case because the Prosecution failed to negative the justification defense of parental discipline" is without merit.

. . . .

Crouser asserts that, because the force he used on Minor did not exceed the level applied in *State v. Deleon,* 72 Haw. 241, 813 P.2d 1382 (1991), and in *Kaimimoku,* it was justifiable under HRS § 703–309(1)(b). In *Deleon,* the trial court convicted the defendant based upon its finding that he was guilty of causing "extreme pain" when he struck his fourteen-year-old daughter six to ten times with a folded belt above the knee and over her pants. The daughter had testified that "she felt a little pain, that the spanking stung her, and that the pain lasted an hour and a half. She had bruises for about a week. She cried for half an hour." *Id.* at 242, 813 P.2d at 1383. Because the phrase "extreme pain" was not defined in the statute, this court employed "an ancient canon of construction," *noscitur a sociis,* and reasoned that the pain inflicted did not come anywhere near, in degree, the other statutorily forbidden results. Thus, we held that the defendant's conduct was justified under HRS § 703–309(1) and reversed the conviction. *Id.* at 244–45, 813 P.2d at 1383–84. We note that, at the time *Deleon* was decided, the other prohibited results were death, serious bodily injury, disfigurement, extreme mental distress, or gross degradation. *Id.*

In *Kaimimoku,* the father had slapped his daughter's face and punched her shoulder, leaving a scratch and a bruise, and causing some pain of unknown duration. Applying the *Deleon* analysis, the ICA [Intermediate Court of Appeals] held that the prosecution had not overcome the defendant's parental discipline justification defense. 9 Haw.App. at 353, 841 P.2d at 1080.

As previously stated, HRS § 703–309(1) was amended in 1992 for the express pur-

pose of "reduc[ing] the permitted level of force that a person responsible for the care of a minor ... may use." Hse. Conf.Comm.Rep. No. 103, in 1992 House Journal, at 843. In order to accomplish the purpose, "the standard of harm [was] lowered by lowering the level of risk, and reducing the permissible level of injury to that which is less than "substantial" as defined in section 707–700 of the Hawaii Penal Code." Sen.Stand.Comm.Rep. No. 2208, in 1992 Senate Journal, at 1023. The changes made reflect the legislature's concern with results of the *noscitur a sociis* analysis employed in *Deleon.* "Death" and "gross degradation" were removed from the enumerated prohibited results because "the lower threshold makes [them] surplusage and [their] elimination removes the risk of other words in that paragraph being interpreted 'noscitur a sociis' with ... term[s] that [are] not pertinent to the lower threshold." Sen.Stand.Comm.Rep. No. 2493, in 1992 Senate Journal, at 1121; Hse.Conf.Comm.Rep. No. 2613, in 1992 House Journal, at 843. "As a result of these changes, the terms retained from the prior law must be reinterpreted by the courts, since the changes affect the application of the rule of construction applied in *State v. Deleon,* 72 Haw. 241, 813 P.2d 1382 (1991)." Sen.Stand.Comm.Rep. No. 2493, in 1992 Senate Journal, at 1121 (parenthetical omitted).

Reinterpreting "extreme pain" in light of the reduced level of force permitted by the amendments, we cannot say that the trial court clearly erred when it found that the use of force caused Minor extreme pain. The permissible level of injury was reduced to that which is less than "substantial bodily injury," which is defined as:

bodily injury which causes:

(1) a major avulsion, laceration, or penetration of the skin;

(2) a chemical, electrical, friction, or scalding burn of second degree severity;

(3) a bone fracture;

(4) a serious concussion; or

(5) a tearing, rupture, or corrosive damage to the esophagus, viscera, or other internal organs.

HRS § 707–700 (1993). Interpreting "extreme pain" *noscitur a sociis* with substantial bodily injury, we believe Minor's pain was comparable in degree to the other statutorily forbidden results, such as a laceration of the skin or a burn of second degree severity. Unlike *Deleon*, where the testimony was that there was "a little pain" for about an hour and a half, or *Kaimimoku*, where the pain was of unknown degree or duration, the testimony in this case was that Minor was in extreme pain for days and unable to sit without pain for weeks. Therefore, we hold that the court's conclusion that "the injuries inflicted by the defendant [were] designed to cause or . . .—known to create a risk of substantial bodily injury, extreme pain or mental distress" was not clearly erroneous.

. . . .

Society recognizes the primary role of parents in preparing children to assume the obligations and responsibilities of adulthood, and it is well-established that parents have a privilege to subject children to reasonable corporal punishment. *Restatement (Second) of Torts* § 147. On the other hand, child abuse is a serious and widespread problem, and the state has a powerful interest in preventing and deterring the battering of children. Section 703–309(1) represents the balance struck by the legislature between these competing interests. Crouser's argument, essentially, is that the line between these competing interests was not drawn clearly enough because the terms used are not defined.

In [*State v.*] *Kameenui*, [69 Haw. 620, 753 P.2d 1250 (1988),] the court explained that the absence of a definition for the term "physical abuse" did not render HRS § 709–906 void for vagueness, stating:

> An ordinary reading of the statute gives sufficient notice to the Defendants that their conduct was prohibited. In a matter as complex as the physical abuse of household members, to require the legislature to list every type of conduct covered under the statute would be counterproductive.

69 Haw. at 622–23, 753 P.2d at 1252. Although the legislature has not exhaustively enumerated the specific injuries that would constitute unjustified use of force against a minor in the name of discipline, HRS § 703–309(1) gives the person of ordinary intelligence a reasonable opportunity to know what conduct is justified. The phrases (1) "reasonably related to the purpose of safeguarding or promoting the welfare of the minor," (2) "designed to cause or known to create a risk of causing," (3) "substantial bodily injury," and (4) "extreme pain or mental distress" are at least as clear as the term "physical abuse" and sufficiently precise to notify Crouser that the law prohibits use of force that causes extensive bruising and prevents sitting at school for days. In *Kaimimoku*, the ICA stated that, "as long as parents use moderate force for permissible purposes in disciplining their children and do not create a substantial risk of the excessive injuries specified in subsection (1)(b), they will not be criminally liable." 9 Haw.App. at 352, 841 P.2d at 1080. The 1992 amendments to HRS § 703–309(1) did not change the clarity of the law; they simply provided a more objective standard and reduced the permissible level of force. An ordinary reading of HRS § 703–309(1) gives sufficient notice to a reasonable person that there are limits to both the purpose and degree of force that may justifiably be used against a minor and defines those limits with reasonable clarity.

*Crouser*, 81 Hawai'i at 11–15, 911 P.2d at 731–35 (footnote omitted).

In *State v. Stocker*, 90 Hawai'i 85, 976 P.2d 399 (1999), the father was convicted of one count of Harassment after he slapped his eleven-year-old son "on one side of the face" with an "open hand". 90 Hawai'i at 88, 976 P.2d at 402. The father argued that "the family court erred in ruling that the prosecution had disproved his parental discipline defense beyond a reasonable doubt." 90 Hawai'i at 92, 976 P.2d at 406. The Hawai'i Supreme Court agreed and stated, in relevant part, as follows:

> The family court stated unambiguously in its oral findings that the "only hang up"

it harbored with respect to "the difficult question" posed by Stocker's defense, which it acknowledged might "have to [be] resolved in the appellate courts," centered on the "proportionality" of the slap to the "misconduct." In other words, the family court determined that "a slap across the face" was not "reasonably proportional" to Shane's "misconduct." We hold that the family court's finding is unsupported by substantial evidence.

The *only* evidence upon which the family court could have based its finding derived from Shane's testimony. In this regard, Shane testified that (1) Stocker slapped him as a result of his failure to come to him after several commands, and (2) the slap (a) was "with an open hand," (b) "didn't hurt ... only hurt a little," and (c) left no mark or bruise. Accordingly, even viewing the evidence in the light most favorable to the prosecution, the inference is inescapable, the use of force being legally justifiable—by legislative mandate—in the context of parental discipline, that the slap did not constitute an unreasonable, excessive, or disproportionate use of force. The family court's view to the contrary appears to have rested on its determination that, on the record before it, *any* slap to the face—no matter how mild—would, as a *per se* matter, have been disproportionate to Shane's misconduct. Although there was no apparent danger to Shane at the time, we cannot agree with the family court's assessment, that, as a matter of law, a single, mild slap to the face is not "reasonably proportional" to a child's refusal to come when repeatedly directed to do so. Although, as this court noted in *Crouser*, the legislature's 1992 amendments to HRS § 703–309(1) accorded the courts greater leeway to determine the parameters of permissible parental discipline, they did not eradicate a parent's prerogative to apply mild force to punish a child's minor misconduct.

*Stocker*, 90 Hawai'i at 96, 976 P.2d at 410.

■ "The defense of parental discipline, as set forth in HRS § 703–309(1), is not an affirmative defense." *Stocker*, 90 Hawai'i at 94 n. 10, 976 P.2d at 408 n. 10 (internal citations omitted). The prosecution has "the burden of disproving beyond a reasonable doubt the justification evidence that was adduced, or proving beyond a reasonable doubt facts negativing the justification defense." *Crouser*, 81 Hawai'i at 11, 911 P.2d at 731 (citation omitted).

In the instant case, FOF no. 5 indicates that the court believed Father and found that Father slapped Daughter 14 with the palm of his hand on the side of her face.

■ In light of the above, we conclude that the State had the burden of proving beyond a reasonable doubt that Father's slap on the side of Daughter 14's face with his palm (a) was not employed with due regard for the age and size of the minor; (b) was not reasonably related to the purpose of safeguarding or promoting the welfare of the minor, including the prevention or punishment of the minor's misconduct in that it (i) was not reasonably proportional to the misconduct being punished; (ii) was not actually (subjective) and reasonably (objective) believed necessary to protect the welfare of the recipient; and (c) was designed to cause or known to create a risk of causing substantial bodily injury, disfigurement, extreme pain or mental distress, or neurological damage. Based on our review of the record, we conclude that the evidence is insufficient to support a finding that the State satisfied its burden of proving items (a), (b)(i), and (c). The controversy pertains solely to item (b)(ii).

In its oral decision, the court decided that "the actions that [Father] took in slapping [Daughter 14], particularly in the face, were not proportionate to the misconduct being punished and were not reasonable under the circumstances.... [T]here were a number of alternatives [available] to [Father] as far as discipline was concerned. And [Father's] actions in physically striking [Daughter 14] were not reasonable or proportionate to the circumstances."

In its written findings and conclusions,

6. The Court finds that [Father's] testimony on his motivation for slapping [Daughter 14] is not credible. It is undisputed that [Father] initiated the confronta-

tion with his daughter by entering the residence, searching his home office and then proceeding further into the residence. At no time did [Father] attempt to defuse the volatile situation or try to reason with his daughter to calm her. Instead, [Father] chose to ignore her and escalate the confrontation; his actions are contrary to any legitimate expression of concern for parental discipline. The Court finds that [Father] simply lost his temper and struck his daughter as a consequence.

. . . .

From the foregoing findings of fact, the Court concludes the following as a matter of law.

. . . .

D. The State has carried its burden of proving beyond a reasonable doubt that [Father's] actions exceeded the defense of justification for parental discipline. . . . Second, [Father] cannot "have it both ways." He cannot initiate and escalate an emotional situation with his family, make no attempt to defuse or calm the situation, and then rely on the justification of parental discipline to excuse the loss of his temper. Simply put, [Father's] actions cannot be seen as "reasonably . . . necessary to protect the welfare of the recipient.". [sic] Based upon the Court's finding that [Father] simply lost his temper and struck his daughter, the Court concludes as a matter of law that the prosecution has carried its burden of proof in overcoming [Father's] asserted parental discipline defense.

In other words, the facts that (1) "[Father] initiated the confrontation with his daughter by entering the residence, searching his home office and then proceeding further into the residence[,]" (2) did not "attempt to defuse the volatile situation or try to reason with his daughter to calm her[,]" and (3) "ignore[d]" his daughter and thereby "escalate[d] the confrontation[,]" led the court to (4) the finding "that [Father] simply lost his temper and struck his daughter as a consequence" and (5) the conclusion that "his actions are contrary to any legitimate expression of concern for parental discipline." The question is whether items (1), (2), and (3) support items (4) and (5). Essentially, the

questions are (a) whether the trial court's finding that Father's slap was not actually (subjective) believed necessary to protect the welfare of Daughter 14 is clearly erroneous, and (b) whether its conclusion that Father's slap was not reasonably (objective) believed to be necessary to protect the welfare of Daughter 14 is right or wrong. To answer these questions, we must have a clear understanding of the relevant facts.

FOF no. 2 indicates that the court did not believe the testimony of Mother and Daughter 14 that Father "was supposed to be at the hospital," and believed the testimony of Father that he was properly released.

The record does not state, and the court did not identify, the "safety issue" that Daughter 14 said was causing her to tell Father to exit his home.

The finding in FOF no. 2 that Father "drove to the bank, withdrew funds and made the required payment, returning to the residence" is clearly erroneous to the extent that it states that Father "made the required payment" before returning to the residence. Father expressly denied paying HECO before returning to the residence and testified that one of the reasons he returned to his home after going to the bank was to pick up the HECO invoice. There is no evidence to the contrary.

FOF no. 3 indicates that, although both Daughter 14 and Mother testified that Daughter 14 called Father a "psycho" and not a "sicko", and Father testified that Daughter 14 called him both a "psycho" and a "sicko", the court found that Daughter 14 called Father only a "sicko".

In sum, the relevant facts show a father lawfully going home after being in the hospital for four days after attempting suicide, being informed that the electricity had been turned off for non-payment of the HECO bill, going to the bank to withdraw money for himself and to pay the HECO bill, returning to his home for the expressed and limited purpose of taking possession of his telephone, his business phone book, and the HECO invoice, being confronted by his fourteen-year-old daughter who loudly and repeatedly called him a "sicko" and demanded that he

exit the house and, when he moved towards the kitchen area to find his address book, physically attempted to block his way. At that point, the father slapped his daughter with an open palm on the side of her face. Based on these facts, we conclude that the trial court's (a) finding that Father's slap was not actually (subjective) believed necessary to protect the welfare of Daughter 14 is clearly erroneous, and (b) conclusion that Father's slap was not reasonably (objective) believed to be necessary to protect the welfare of Daughter 14 is wrong.

The State admits that "[a]t the first glance, [Daughter 14's] demeanor seemed to call for parental discipline which might justify [Father's] action." The State argues, however, that Daughter 14's behavior was justified because the record "reveals the emotional turmoil of the young teen, who saw her father for the first time in four days after he had attempted suicide." Furthermore, Daughter 14 testified that "her demand of [Father] to leave the house was in part because of her desire that he should have stayed at the hospital 'as long as he needed to be.'" The State concluded that any "initial urge to discipline [Daughter 14] seemed to have drastically reduced, if not diminished, as her emotions became more understandable in light of the totality of the circumstances." However, Father did, in fact, stay at the hospital "as long as he needed to be" there. To the extent that the State is arguing that Daughter's actions and words were not misconduct, its argument is not supported by the record.

Obviously, there are people who disagree with the parental discipline defense stated in HRS § 703–309(1). Mother testified that "I don't think it's appropriate for any ... person to hit anyone, not anyone, especially a child." Nevertheless, it is the law in Hawai'i and Father cannot be convicted in this case unless the State satisfied its burden of disproving it. It must be understood that it is not illegal for a parent to use force upon or toward his or her child to punish the child's misconduct unless the State can disprove, beyond a reasonable doubt, the parental discipline defense presented.

Similarly, it appears that there are people who believe that the parental discipline defense authorizes physical punishment only as a last resort after the child is given a prior explanation and warning, and other non-physical alternatives fail. In its oral decision, the trial court considered the fact that "there were a number of alternatives [available] to [Father] as far as discipline was concerned." In its written findings and conclusions, the court considered the fact that "[a]t no time did [Father] attempt to defuse the volatile situation or try to reason with [Daughter 14] to calm her. Instead, [Father] chose to ignore her and escalate the confrontation[.]" The court concluded that Father "cannot initiate and escalate an emotional situation with his family, make no attempt to defuse or calm the situation, and then rely on the justification of parental discipline to excuse the loss of his temper." In other words, the trial court concluded that a father's physical punishment of a fourteen-year-old daughter is not actually (subjective) and reasonably (objective) believed necessary to protect the welfare of the daughter if, prior to the physical punishment, the father has not attempted to defuse or calm the volatile situation or tried to reason with the daughter. We conclude that the scope of the physical parental discipline permitted by HRS § 703–309(1) is not that limited.

## CONCLUSION

In light of the above, we conclude that (1) the court's conclusion of law D, that "[Father's] actions cannot be seen as "reasonably ... necessary to protect the welfare of the recipient" is wrong, and (2) the State failed its "burden of disproving beyond a reasonable doubt the justification evidence that was adduced, or proving beyond a reasonable doubt facts negativing the justification defense." *Crouser*, 81 Hawai'i at 11, 911 P.2d at 731 (citation omitted).

Accordingly, we reverse the June 20, 2003 Judgment of Conviction and Sentence convicting Defendant–Appellant Dieter Thate of the offense of Harassment, HRS § 711–1106.